[No. D001309. Fourth Dist., Div. One. Jan. 13, 1986.]

STANDARD PACIFIC OF SAN DIEGO,
Cross-complainant and Appellant, v.
A. A. BAXTER CORPORATION et al.,
Cross-complainants and Respondents.

[And four other cases.][1]

---

[1]*Christiana Community Builders* v. *A. A. Baxter Corporation* (Nos. D001836, D001852, D002210); *Standard Pacific of San Diego* v. *A. A. Baxter Corporation* (No. D001842).

## Counsel

Davis & Digrazia, Wesley L. Davis, Robert L. Balmuth, Bacalski & Lincoln, Thomas J. Lincoln, Ropers, Majeski, Kohn, Bentley & Wagner, Ropers, Majeski, Kohn, Bentley, Wagner & Kane, Michael J. Brady, Mark G. Bonino and Linda G. Weissinger for Cross-complainants and Appellants.

Rhoades, Hollywood & Neil, B. E. Sulzner, McInnis, Fitzgerald, Rees, Sharkey & McIntyre, James E. Chodzko, James R. Milliken and Virginia R. Gilson for Cross-complainants and Respondents.

## Opinion

**STANIFORTH, Acting P. J.**—These consolidated appeals challenge determinations that settlements made by defendants A. A. Baxter Corporation (Baxter), Woodward-Clyde Consultants and Woodward Gizienski & Associates (collectively Woodward-Clyde) with plaintiff homeowners were made in good faith and thus bar cross-complaints for equitable indemnity from Baxter and Woodward-Clyde.

Plaintiffs in the underlying action are homeowners in subdivisions in the Tierrasanta area of San Diego. Their homes were damaged by soil subsidence.

Christiana Community Builders (Christiana) originally owned the undeveloped land underlying plaintiffs' homes. Christiana contracted with Woodward-Clyde to perform soil testing and engineering and with Baxter to perform grading to Woodward-Clyde's specifications. Christiana then sold some of the manufactured lots to Standard Pacific of San Diego (Standard Pacific) and some to Kaiser Aetna and Ponderosa Homes (collectively Ponderosa) who built single-family residences on the lots and sold them to plaintiffs.

During 1981 through 1983, plaintiffs, in three separate actions (Super. Ct. Nos. 468789, 491800, 507760[2]) sued Christiana, Standard Pacific, Ponderosa, Woodward-Clyde and Baxter and others for breach of contract, breach of implied warranty, negligence and strict liability for the damage to their homes. Christiana, Standard Pacific and Ponderosa cross-complained against each other, Woodward-Clyde, Baxter and others for indemnity, contribution and declaratory relief.

In 1983 and 1984 Woodward-Clyde and Baxter entered into settlement agreements with many of the plaintiffs and sought a judicial determination the settlements were made in good faith. All the settlements were approved as being made in good faith. As a result, appellants' cross-complaints for comparative indemnity and contribution against Woodward-Clyde and Baxter were dismissed.

On appeal, Christiana, Standard Pacific and Ponderosa contend the settlements were not made in good faith and bore no relationship between Woodward-Clyde's and Baxter's exposure to liability and the extent of damages suffered by plaintiffs. Standard Pacific additionally asserts even if the settlements were made in good faith, it is not precluded from seeking total indemnification. In short, Standard Pacific contends its claim for total indemnity—as opposed to comparative equitable indemnity—survives a tortfeasor's good faith settlement made pursuant to Code of Civil Procedure section 877.6.

DISCUSSION

I

Under the procedures of Code of Civil Procedure[3] section 877.6, subdivision (c), if a court determines a tortfeasor made a settlement in good faith, then any other joint tortfeasor is barred from any claims against the settling tortfeasor for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault. The party asserting the lack of good faith bears the burden of proof. (§ 877.6, subd. (d).)

Below, Christiana, Standard Pacific and Ponderosa argued a settlement which was disproportionately low compared to potential liability—as was alleged with the settlements here—was not a settlement in good faith,

---

[2]Woodward-Clyde was not named in case No. 507760.

[3]All statutory references are to the Code of Civil Procedure unless otherwise specified.

as that concept is reflected in *River Garden Farms, Inc.* v. *Superior Court* (1972) 26 Cal.App.3d 986, 997 [103 Cal.Rptr. 498]. In contrast, Woodward-Clyde and Baxter argued a settlement should be deemed made in good faith so long as there was no collusion or other tortious conduct involved, a view reflected in *Dompeling* v. *Superior Court* (1981) 117 Cal.App.3d 798, 809-810 [173 Cal.Rptr. 38]. At the time the settlements involved here were approved, our court had adopted the *Dompeling* approach. (See *Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates,* 4 Civ. 26602, hg. granted, Nov. 10, 1983; see also *Widson* v. *International Harvester Co.* (1984) 153 Cal.App.3d 45, 58 [200 Cal.Rptr. 136], citing *Dompeling* with approval but also engaging in an analysis of the reasonableness of the settlement amount in light of potential exposure.) Presumably, the trial courts here also followed the *Dompeling* approach.[4]

However, while the cases at bench were pending on appeal, the Supreme Court issued its opinion in *Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates* (1985) 38 Cal.3d 488 [213 Cal.Rptr. 256, 698 P.2d 159]. The Supreme Court expressly disapproved of specific holdings in *Dompeling* and its progeny *(Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates, supra,* 38 Cal.3d 488, 500, fn. 6) and approved *River Garden Farms.* The Supreme Court held the amount of a settlement in light of potential liabilities was relevant to a good faith determination under section 877.6.

The Supreme Court observed section 877.6 was a codification of its opinion in *American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578 [146 Cal.Rptr. 182, 578 P.2d 899]. *(Tech-Bilt, supra,* at p. 496.) In *American Motorcycle,* the court had construed section 877 to discharge a settling concurrent tortfeasor from claims for partial or comparative indemnity. To explicate the meaning of the term "good faith settlement" in section 877, the court in *American Motorcycle* cited *River Garden Farms.* By codifying *American Motorcycle* in section 877.6, the Supreme Court reasoned, the Legislature implicitly adopted *American Motorcycle*'s equitable policies of not only encouraging settlements but also equitably allocating costs among joint tortfeasors. *(Tech-Bilt, supra,* at pp. 498-499.) The *Tech-Bilt* court found: "Those policies would be disserved by an approach which emphasizes one to the virtual exclusion of the other." *(Id.* at p. 499.)

The *Tech-Bilt* court concluded a trial court should be able to inquire "whether the amount of the settlement is within the reasonable range of the settling tortfeasor's proportional share of comparative liability for the plain-

---

[4]In case No. 507760 Judge Low expressly rejected appellants' argument proportionality was relevant.

tiff's injuries." (38 Cal.3d at p. 499.) If the party asserting the lack of good faith is able to demonstrate the settlement figure is "so far 'out of the ballpark' . . . as to be inconsistent with the equitable objectives of the statute," then the party establishes the settlement is not a "good faith" settlement within the meaning of section 877.6. (*Id.* at pp. 499-500.)

The Supreme Court, however, made it clear a showing that a settling defendant paid less than his theoretical proportionate or fair share would not in itself establish bad faith since a disproportionately low settlement figure might be reasonable in light of the settling defendant's relative insolvency, underinsurance or lack of insurance, the speculative nature of the damages or the uncertainty or remoteness of legal liability. (*Tech-Bilt, supra,* 38 Cal.3d 488, 499.) The court expressed concern that "such a rule would tend to convert the pretrial settlement approval procedure into a full-scale minitrial." (*Ibid.*)

For the guidance of the trial courts, the Supreme Court in *Tech-Bilt* enumerated a number of factors relevant to determining whether a settlement was made in good faith under section 877.6, including: "a rough approximation of plaintiffs' total recovery and the settlor's proportionate liability, the amount paid in settlement, the allocation of settlement proceeds among plaintiffs, and a recognition that a settlor should pay less in settlement than he would if he were found liable after a trial. Other relevant considerations include the financial conditions and insurance policy limits of settling defendants, as well as the existence of collusion, fraud, or tortious conduct aimed to injure the interests of the nonsettling defendants. [Citation.] Finally, practical considerations obviously require that the evaluation be made on the basis of information available at the time of settlement. '[A] defendant's settlement figure must not be grossly disproportionate to what a reasonable person, at the time of the settlement, would estimate the settling defendant's liability to be.' (*Torres* v. *Union Pacific R. R. Co.* (1984) 157 Cal.App.3d 499, 509 . . . .)" (*Tech-Bilt, supra,* 38 Cal.3d 488, 499.)

Christiana, Standard Pacific and Ponderosa assert their share of liability was minimal since the damages were caused by improper soil testing, grading and compaction, for which Baxter and Woodward-Clyde were concededly responsible. Furthermore, Standard Pacific asserts it is a "mere distributor," not a tortfeasor, let alone a joint tortfeasor.

Baxter asserts on the other hand its liability was minimal since it performed the grading under the "direct observation and supervision" of Woodward-Clyde and Woodward-Clyde certified the lots were properly compacted to the requisite 90 percent relative compaction. Baxter contends

it was neither aware of any defective condition nor even capable of making such a determination by itself. Further, Baxter argues the evidence shows the subsidence was most likely the result of high moisture content caused by rainfall, excessive irrigation and landscape watering by homeowners rather than poor compaction.

Woodward-Clyde does not argue the limited nature of its liability but asserts its settlements were justified by the expense of multi-party litigation. It argues its settlements were neither grossly disproportionate to liability nor shockingly low on their face. The damages claimed and the recitation of the bases asserted for liability of these two specific defendants examined vis-à-vis Standard Pacific puts these factual postures in question.

Factually, there is no doubt Baxter did the land compaction under the direction of Woodward-Clyde. As to the amount of damages claimed in case No. 468789, plaintiffs sought a total of $450,000 in damages. Baxter settled with all plaintiffs for a total of $21,000. Woodward-Clyde settled for a total of $75,000. Both settlements were evenly divided among plaintiffs. In its brief on appeal, Woodward-Clyde represents the most damaged house would cost $60,000 to repair.

In case No. 491800, the settling plaintiffs[5] sought approximately $2.3 million. Both Baxter and Woodward-Clyde settled for $16,660 for each damaged home for total settlements by Baxter and Woodward-Clyde of $366,520. Appellants had offered the settling plaintiffs amounts varying from $5,000 to $147,000. Five of their offers were more than Baxter's and Woodward-Clyde's combined settlements—$37,500, $63,500, $65,000, $67,500 and $147,500. Five were less than the combined settlements, with the lowest being $5,000 for a house not physically impacted because it was located on a cut rather than fill and the rest averaging about $18,500. This represents settlement offers totalling about $450,000.

Finally, in case No. 507760, Baxter settled for $10,000 per damaged home for a total of $120,000.

Baxter's proffered legal support here and at the trial court level for the trial court's finding of good faith consists of a citation of authorities over-ruled in *Tech-Bilt, Inc., supra.* The "competing interpretation" of the good faith requirement, to wit, "good faith" is the equivalent of "absence of tortious conduct" (38 Cal.3d at p. 499)—as suggested by *Dompeling* v.

---

[5]The settling plaintiffs represented about 11 of the approximately 40 homes involved set-tled.

*Superior Court, supra,* 117 Cal.App.3d 798, and its progeny—was specifically disapproved by the *Tech-Bilt* court. (*Tech-Bilt, supra,* at p. 500, fn. 7.)

We conclude the trial court used the wrong standard for determining good faith, i.e., "lack of tortious conduct." We cannot and do not rely on the substantial evidence test to support the trial court's determinations of good faith except on the issue of the lack of tortious conduct. That issue is not disputed on appeal. We cannot say as a matter of fact or law that the settlements here were within the "reasonable range" given the potential exposure of both Baxter and Woodward-Clyde. Facially, the settlements appear to be well without the bound of a proportionate fair share. They appear to be "out of the ball park." We cannot say as a matter of fact or law the settlements were made in good faith. Patently, they were not the result of settlement proceedings held conformable to the standards enunciated in *Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates, supra.* For each of those reasons the judgment must be reversed.

## II

 Standard Pacific next contends the trial court erred in dismissing its claim for total indemnification based on strict liability (public policy imposed nonnegligent liability). It argues neither *American Motorcycle* nor section 877.6 bars a claim for total indemnification and it, as a "mere distributor of defective lots" sought to be held liable solely on a strict liability basis, should be able to obtain full indemnification from Woodward-Clyde and Baxter despite the settlements.

The Supreme Court has not yet resolved the issue of whether a defendant whose liability is solely derivative or vicarious can seek full indemnification from a defendant who has entered a good faith settlement. (See *Mesler* v. *Bragg Management Co.* (1985) 39 Cal.3d 290, 305 [216 Cal.Rptr. 443, 702 P.2d 601]; *Safeway Stores, Inc.* v. *Nest-Kart* (1978) 21 Cal.3d 322, 332 [146 Cal.Rptr. 550, 579 P.2d 441].) The Courts of Appeal are divided on this issue. Certain Courts of Appeal have held a good faith settlement bars the common law total equitable indemnification claim by a defendant who is only secondarily or vicariously liable (*Turcon Construction, Inc.* v. *Norton-Villiers, Ltd.,* (1983) 139 Cal.App.3d 280, 284 [188 Cal.Rptr. 580]; *City of Sacramento* v. *Gemsch Investment Co.* (1981) 115 Cal.App.3d 869, 877 [171 Cal.Rptr. 764]; see also *Kohn* v. *Superior Court* (1983) 142 Cal.App.3d 323, 330 [191 Cal.Rptr. 78]; *Lopez* v. *Blecher* (1983) 143 Cal.App.3d 736 [192 Cal.Rptr. 190]; *Torres* v. *Union Pacific R. R. Co.* (1984) 157 Cal.App.3d 499 [203 Cal.Rptr. 825].)

Other appeal courts disagree, however, finding the common law right to a "total" or "full" indemnification continues to exist as a separate and distinct doctrine from that of comparative indemnity (see *Angelus Associates Corp.* v. *Neonex Leisure Products, Inc.* (1985) 167 Cal.App.3d 532, 542 [213 Cal.Rptr. 403]; *E. L. White* v. *City of Huntington Beach* (1982) 138 Cal.App.3d 366, 375-376 [187 Cal.Rptr. 879].) In *Huizar* v. *Abex Corp.* (1984) 156 Cal.App.3d 534 [203 Cal.Rptr. 47], the court held: "[W]e are *of the opinion that, absent statutory authority to the contrary, justice demands total indemnity where the liability of a completely blameless party is premised solely upon the tortious act or omission of another.* Accordingly, we hold that the doctrine of equitable or total indemnity continues to exist separate and distinct from that of comparative indemnity." (*Id.* at p. 542.)

The *Huizar, Angelus* and *White* conclusions must be examined in light of certain broad and dispositive principles found in both statute and judicial declarations. Before the Supreme Court's decision in *American Motorcycle Assn.* v. *Superior Court, supra,* 20 Cal.3d 578, the equitable indemnity doctrine was an all-or-nothing concept. Liability was shifted entirely from one tortfeasor to another and only when the tortfeasor seeking indemnification was entirely innocent of wrongdoing. If the tortfeasor was not entirely innocent, then he was not entitled to any indemnification. (See *Pearson Ford Co.* v. *Ford Motor Co.* (1969) 273 Cal.App.2d 269, 276 [78 Cal.Rptr. 279].) In *American Motorcycle,* the Supreme Court concluded in light of the adoption of comparative principles, "the current equitable indemnity rule should be *modified* to permit a concurrent tortfeasor to obtain partial indemnity from other concurrent tortfeasors on a comparative fault basis." (20 Cal.3d 578, 598; italics added.)

The Supreme Court later explained "the *American Motorcycle* decision clearly reveals that this court did not purport to create a wholly new equitable indemnity action . . . . [¶] . . . *American Motorcycle* did not establish a new cause of action separate and distinct from the traditional equitable indemnity action, but simply modified the all-or-nothing aspect of the pre-*American Motorcycle* doctrine to permit partial indemnification in appropriate cases." (*People* ex rel. *Dept. of Transportation* v. *Superior Court* (1980) 26 Cal.3d 744, 756 [163 Cal.Rptr. 585, 608 P.2d 673], fn. omitted.)

Based on the explicit language of *American Motorcycle* and the Supreme Court's explanation in *People* ex rel. *Dept. of Transportation,* we cannot agree with the views expressed in *Huizar* and *Angelus* that the comparative equitable indemnity doctrine adopted in *American Motorcycle* and codified in section 877.6 is "separate and distinct" from the common law doctrine

of "total" indemnification. (Compare *Angelus Associates Corp.* v. *Neonex Leisure Products, Inc., supra,* 167 Cal.App.3d 532, 542; *Huizar* v. *Abex Corp., supra,* 156 Cal.App.3d 534, 542; see also dissent in *City of Sacramento* v. *Gemsch Investment Co., supra,* 115 Cal.App.3d 869, 878.)

As the Supreme Court explained in *Daly* v. *General Motors Corp.* (1978) 20 Cal.3d 725, 742 [144 Cal.Rptr. 380, 575 P.2d 1162], the court adopted the term "comparative fault," although the process could more accurately be described as "equitable apportionment of loss" because the term "comparative fault" had gained wide acceptance. The court observed: "[W]here, as here, a consumer or user sues the manufacturer or designer alone, technically, neither fault nor conduct is really compared functionally. The conduct of one party in combination with the product of another, or perhaps the placing of a defective article in the stream of projected and anticipated use, may produce the ultimate injury. In such a case, as in the situation before us, *we think the term 'equitable apportionment or allocation or loss' may be more descriptive than 'comparative fault.'*" (*Id.* at p. 736, italics added.)

*Daly* was concerned with whether comparative principles should be extended to a situation involving a negligent plaintiff and a defendant held liable on a theory of strict products liability, therefore it is instructive in this case. When the term "comparative fault" is read to encompass the concept "equitable allocation or apportionment of loss," then it appears to subsume the common law concept of total indemnification. Total indemnification is nothing more than equitable allocation of all of the loss to another party. Thus a distinction based on "comparative negligence" or "comparative fault" is artificial.

In *Angelus Associates Corp.* v. *Neonex Leisure Products, Inc., supra,* 167 Cal.App.3d 532, 541-542, the court justified the continued existence of the common law doctrine of total indemnification, saying: "But how then do we categorize the conduct of the innocent retailer vis-à-vis the manufacturer of the completed product or the allegedly defective part? As to the person or entity ultimately responsible for the defective product, the retailer is neither a wrongdoer nor a tortfeasor. And where there is no wrongdoing to *apportion,* the principles of comparative fault cannot apply."

We fault this reasoning. Wrongdoing can be apportioned 100 percent to the manufacturer and zero percent to the innocent retailer. Comparative equitable indemnity includes the entire range of possible apportionments, from no right to any indemnity to a right of complete indemnity. Total

indemnification is just one end of the spectrum of comparative equitable indemnification.

In *Huizar* v. *Abex Corp.*, *supra*, 156 Cal.App.3d 534, 542, the court concluded "justice demands" a defendant retain the common law right to total indemnification from another defendant even though that defendant entered into a good faith settlement. *Torres* v. *Union Pacific R. R. Co.*, *supra*, 157 Cal.App.3d 499, 511, footnote 5, responded to this justification, explaining *Huizar* created an exception to the "harsh interpretation" of sections 877 and 877.6 which barred claims for equitable indemnification from a settling tortfeasor no matter what the amount of the settlement so long as the settlement did not involve tortious conduct. The *Torres* court, however, *questioned whether such an exception was necessary if a broader definition of good faith was adopted*, i.e., a definition which included an examination of the reasonableness of the settlement amount in light of the other defendants and the total liability involved.

### III

We agree with the reasoning of the *Torres* court for this was the definition ultimately adopted by the Supreme Court in *Tech-Bilt*. *Tech-Bilt* holds there should be an extension of the critical inquiry into fair apportionment; that "good faith" as intended by the Legislature encompasses a broader range of considerations than mere absence of palpable wrongdoing.

The Supreme Court explained in *Tech-Bilt*, section 877.6 is designed to further two equitable policies: (1) encouragement of settlements and (2) equitable allocation of costs among joint tortfeasors. (*Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates*, *supra*, 38 Cal.3d 488, 499.) The court pointed out: "Those policies would be disserved by an approach which emphasizes one to the virtual exclusion of the other." (*Ibid.*)

The *Huizar-Angelus-White* approach allowing total indemnification is an approach which emphasizes only one policy, equitable allocation of costs among joint tortfeasors, to the virtual exclusion of the other, encouragement of settlements. Sections 877 and 877.6 encourage settlements with the incentive of barring claims for equitable indemnification. The rule announced in *Huizar-Angelus-White* eliminates this incentive and thwarts the legislative policy of encouraging settlements. It would effectively preclude settlements by primarily liable defendants where vicarious liability of a defendant was involved.

In contrast, disallowing a total indemnification claim following a good faith hearing conducted under the *Tech-Bilt* standards represents a

reasonable accommodation of both policies. Under *Tech-Bilt* the settlement will not be found in good faith unless the amount is reasonable in light of the settling tortfeasor's proportionate share of liability. This procedure requires accounting for the comparative lack of fault of a vicariously liable defendant who may have a right of total indemnification against the settlor absent any settlement.

A good faith hearing is what "justice demands." A result where the "factually innocent" party may eventually assume some degree of liability (since a good faith settlement does not require a precise proportionate share of liability but only that it be within the reasonable range) does not compel a different result. The nonsettlor sharer of liability—whose liability rests upon public policy considerations other than a tortious wrongdoing— is in a position similar to that of a "near factually innocent" tortfeasor, e.g., an individual one percent negligent, who is clearly barred by section 877.6 from seeking any equitable indemnification from a settling tortfeasor who is 99 percent negligent. We see no reason to be found in section 877.6 to allow one a surviving right of total indemnification despite a settlement while denying the right to the traditional tortfeasor.

## IV

 Finally, Standard Pacific contends section 877.6 does not bar it from seeking equitable indemnification based on strict liability because it is not a *"tortfeasor"* within the meaning of the statute.

In *Turcon Construction, Inc.* v. *Norton-Villiers, Ltd., supra,* 139 Cal.App.3d 280, 282-283, the court rejected the argument the term "joint tortfeasors" as used in section 877.6 was limited to those who act in concert to cause an injury. The court noted the historical meaning of "joint tortfeasor" had been expanded to include joint, concurrent and successive tortfeasors and concluded, and, in light of settled principles of statutory construction, the Legislature intended the broader concept when it enacted section 877.6 (*Ibid.*) (See also *Blecker* v. *Wolbart* (1985) 167 Cal.App.3d 1195, 1200 [213 Cal.Rptr. 781], fn. 2.)

 In the context of a vicariously liable settlor, the *Turcon* court barred relief sought by cross-complaint, citing Code of Civil Procedure sections 877 and 877.6. The court said: "The concepts of primary versus secondary negligence and passive versus active negligence, which formerly provided a basis for equitable indemnity, have been subsumed by adoption of the pure comparative fault doctrine in *Li* v. *Yellow Cab* (1975) 13 Cal.3d 804 . . ., and the holding in *American Motorcycle Assn.* v. *Superior Court,*

*supra*, 20 Cal.3d 578 . . ., that the comparative fault doctrine embraced equitable indemnity. (Also see *City of Sacramento* v. *Gemesch Ins. Co.* (1981) 115 Cal.App.3d 869 . . . .)" (139 Cal.App.3d 280, 284.)

In *City of Sacramento* v. *Gemesch Investment Co.*, *supra*, 115 Cal.App.3d 869, the court said: "Where the transaction rests upon related facts, either concurrent or successive, joint or several, which legally create a detriment compensable against multiple actors, the right of indemnity should follow *AMA* [*American Motorcycle Assn.* v. *Superior Court*] guidelines, unless a contract or statute otherwise provides.

" . . . . . . . . . . . . . . . . . . . . . . .

"Further, pertinent language of Code of Civil Procedure section 877 does not help the City. The clause therein 'to one or more of a number of tort-feasors claimed to be liable for the same tort' is broad, not limiting. It does not say 'joint tortfeasors,' or parties who are governmental entities, or who are passive/negative/secondary. Equitably interpreted, this broad language includes such alleged tortfeasors. Therefore, the conduct of the City was and should be measurable under *AMA* tests." (*Id.* at p. 877.) It followed. No surviving claim for equitable indemnification was allowed. (*Ibid.*)

Most recently, the Supreme Court in *Mesler* v. *Bragg Management Co.*, *supra*, 39 Cal.3d 290, 302, held: "It has been argued that section 877 covers only joint tortfeasors, while the fate of parties other than joint tort-feasors must be determined by chapter 2. [Citation.]

"The short answer to this argument is that chapter 2 deals only with judgment debtors and their rights to obtain contribution from other tortfea-sors, and thus is not applicable to cases involving prejudgment settlements. More to the point, the language of section 877 is significant—its drafters did not use the narrow term 'joint tortfeasors,' they used the broad term 'tortfeasors claimed to be liable for the same tort.' This language was meant to eliminate the distinction between joint tortfeasors and concurrent or suc-cessive tortfeasors (4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 39, p. 2338), and to permit broad application of the statute. (*City of Sac-ramento* v. *Gemsch Investment Co.* (1981) 115 Cal.App.3d 869, 877 . . .; *Ritter* v. *Technicolor Corp.* (1972) 27 Cal.App.3d 152, 154 . . . .) *Further, another section in chapter 1 expressly extends beyond application to joint tortfeasors: section 876, subdivision (b), applies to 'one or more persons . . . liable solely for the tort of one of them or of another, as in the case of*

*the liability of a master for the tort of his servant.'"* (Italics added, fn. omitted.)

These general conclusions as to the preclusive breadth of sections 877 and 877.6 are buttressed by the holding in *Daly* v. *General Motors Corp., supra,* 20 Cal.3d 725, where the Supreme Court expressly held comparative fault principles apply to actions founded on strict liability.

Writing for the majority, Justice Richardson asserted that fairness requires that comparative fault be applied to strict liability: "We reiterate that our reason for extending a full system of comparative fault to strict products liability is because it is fair to do so. The law consistently seeks to elevate justice and equity above the exact contours of a mathematical equation. We are convinced that in merging the two principles, what may be lost in symmetry is more than gained in fundamental fairness." (*Daly* v. *General Motors Corp., supra,* 20 Cal.3d 725, 742.)

The Supreme Court was confronted with the argument that strict liability and negligence cannot be logically accommodated. In his dissenting opinion, Justice Jefferson wrote: "Because the legal concept of negligence is so utterly different from the legal concept of a product defective by reason of manufacture or design, a plaintiff's negligence is no more capable of being rationally compared with a defendant's defective product to determine what percentage each contributes to plaintiff's total damages than is the quart of milk with the metal bar . . . ." (*Id.* at p. 752.)

This analysis suggests that the majority's approach would lead to absurd results because it attempts to allocate fault to a party who may not be at fault.

This reasoning did not persuade the majority. Justice Richardson acknowledged that there are "semantic" distinctions between strict liability and negligence, but asserted that these doctrines could be successfully "blended or accommodated." (*Daly* v. *General Motors Corp., supra,* 20 Cal.3d 725, 734.) Legal concepts in this area do not have fixed definitions, according to the majority.

These principles were applied in *Safeway Stores, Inc.* v. *Nest-Kart, supra,* 21 Cal.3d 322, a supplier of a defective cart.

Given the predicate that comparative fault principles are to be applied to strict liability cases, reason and logic compel the conclusion that equitably

interpreted the statute's broad language includes such parties whose legal responsibilities are derivative or vicarious in nature.

We conclude that barring a distinct and separate claim for complete equitable indemnification by a party in status such as Standard Pacific from a tortfeasor who has settled in good faith, conformable to *Tech-Bilt, Inc., supra,* standards, represents a reasonable compromise between the competing legislative policies expressed in section 877 and 877.6.

The judgments are reversed.

Wiener, J., and Work, J., concurred.