[No. F008103. Fifth Dist. July 10, 1987.]

ELMER L. HORTON et al., Petitioners, v.
THE SUPERIOR COURT OF KERN COUNTY, Respondent;
WESTERN FARM SERVICE, INC., et al., Real Parties in Interest.

COUNSEL

Mills, Lane, Drace & Derryberry and George I. Lane for Petitioners.

No appearance for Respondent.

Borton, Petrini & Conron, Dale Dorfmeier, Kuhs & Parker and Ralph W. Wyatt for Real Parties in Interest.

OPINION

FRANSON, J.—

### STATEMENT OF FACTS

In late 1980, plaintiffs and real parties in interest Alex and Jane Sarad, doing business as Janal Farms (hereafter plaintiffs), contracted with defendant and real party in interest Western Farm Service, Inc. (hereafter Western Farm), to spray their 68-acre citrus crop with a pesticide to control the potato leaf hopper which damages the rind of the citrus during the wintertime. According to the oral agreement, Western Farm and its employee, Ben Erickson,[1] were "to recommend, sell and supply a suitable pesticide ...." Plaintiffs had previously warned Western Farm that their Valencia orange crop had suffered severe copper burn several years earlier due to

---

[1] Erickson is a named defendant and real party in interest. As his defense was handled by Western Farm, however, we will not discuss him individually; further references to Western Farm refer to Erickson as well.

application of a pesticide containing copper sulfate. Western Farm recommended a different pesticide also containing copper sulfate, to be applied in a "Bordeaux mixture or whitewash solution." Western Farm's original recommended mix included six parts hydrated lime for every two parts copper sulfate; the presence of the lime "safens" the mix, permitting the copper to attack the target pest while preventing copper damage to the crop.

Defendants and petitioners Horton and Crumbliss[2] (hereafter petitioners) were independent contractors hired by Western Farm to mix and apply the pesticide mixture. Someone, possibly petitioners, felt that the 6/2 ratio of hydrated lime to copper sulfate was inadequate to prevent copper injury, and recommended that the ratio be raised to 10/2; this was done. Nonetheless, some months after application of the pesticide mix by petitioners, plaintiffs observed damage to the Valencia crop that was subsequently identified as copper injury.

Plaintiffs set out five causes of action in their complaint. The first cause of action alleged that the pesticide "was defective and unsafe for its intended purpose when applied in accordance with the label therefor ...."

The second cause of action alleged an implied warranty by Western Farm that the pesticide was fit for the purpose for which it was applied. The third cause of action similarly alleged an implied warranty of merchantability by Western Farm.

The fourth cause of action alleged negligence on the part of all defendants in recommending, supplying, mixing and applying the pesticide, and in assuring the plaintiffs that defendants were familiar with the risks involved in the intended use of the pesticide.

The fifth and final cause of action alleged that all defendants operated "in a faulty, careless or negligent manner" in violation of Food and Agricultural Code section 11791, subdivision (b).

The complaint alleged a total of $426,168.41 in damages: $106,000 for damage to the 1980-1981 Valencia crop, $318,000 for damage to the 1981-1982 crop, and $2,168.41 for the cost of purchasing and applying the pesticide solution.

Petitioners' answer was filed February 28, 1984; they simultaneously filed a cross-complaint for partial and total indemnification against Western

---

[2] Petitioner Ruth Mae Crumbliss is executrix of the will of Fred W. Crumbliss.

Farm. Western Farm in turn answered the complaint and answered and denied generally the allegations of the cross-complaint. Western Farm also filed its own cross-complaint for indemnity against petitioners.

A mandatory settlement conference was held November 20, 1986, before Judge Davis. Plaintiffs, petitioners and Western Farm submitted settlement conference statements. The bulk of the conference was off the record; the reporter's transcript of the conference begins with Judge Davis's announcement that "We have a settlement ...." Plaintiffs and Western Farm had agreed to settle for $50,000. Counsel for Western Farm subsequently moved for a determination of the good faith of the settlement (Code Civ. Proc., § 877.6) and for an order dismissing both cross-complaints; petitioners filed opposition papers.

On December 12, 1986, the hearing on the good faith determination motion was held before Judge Davis, the same judge who presided over the settlement conference. The parties presented their arguments and declarations on the question of the good faith of the settlement, i.e., "whether the amount of the settlement [was] within the reasonable range of the settling tortfeasor's proportional share of comparative liability for the plaintiff's injuries." (*Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates* (1985) 38 Cal.3d 488, 499 [213 Cal.Rptr 256, 698 P.2d 159].) Petitioners' counsel, George Lane, argued the $50,000 settlement between plaintiffs and Western Farm was grossly disproportionate to Western Farm's liability to plaintiffs. Mr. Lane stated his approval of Judge Davis hearing the good faith motion but argued that the court's approval of the settlement was not "dispositive of the issue of good faith."

Judge Davis ruled that the $50,000 paid by Western Farm in settling this case "is well within the ball park" of Western Farm's liability, and concluded that the settlement was in good faith. In so ruling, the judge revealed that he had taken an active role in negotiating the settlement.

"So, I think this amount of money that was paid by the defendant, Western Farm Service was imminently [*sic*] reasonable.

"I told both Mr. Wyatt and Mr. Dorfmeier that. I had more trouble convincing Mr. Dorfmeier of the reasonableness of it than I did with Mr. Wyatt." Petitioners did not object to the judge's admission that he had actively participated in the settlement negotiations and that he had recommended to counsel for the settling parties the reasonableness of the settlement.

Petitioners seek mandamus to redress three alleged abuses of discretion by the trial court below. We reject each of the contentions.

## DISCUSSION

I. *The settlement judge did not abuse his discretion in hearing the motion to determine the good faith of the settlement.*

 Petitioners argue that the good faith finding should be set aside because "the judge urged the reasonableness of the settlement upon the settling parties" at the settlement conference and then presided over the good faith hearing without disclosing his prior opinion in the matter.

We first observe that a settlement conference judge does not decide anything—he merely uses his judicial status to help the parties reach a settlement if reasonably possible. To this end it has been said that the judge should actively participate in the negotiating process to "break the ice" between litigants who may be reluctant to settle. The judge should also use any expertise he may have in the subject area of the litigation to express his opinions of the settlement value of the various causes of action against the different defendants or of the range in which negotiations may realistically proceed. He should listen to and carefully evaluate the parties' personal contentions so they will feel they have had their "day in court" if the case is settled. (Cal. Pretrial and Settlement Procedures (Cont.Ed.Bar 1963) § 7.3, p. 170; see also *Mezzetti* v. *Superior Court* (1979) 94 Cal.App.3d 987, 992 [156 Cal.Rptr. 802].)

In light of the judge's role at the settlement conference, it is most naive for petitioners to suggest they had no reason to believe that Judge Davis had formed an opinion on the reasonableness of the $50,000 settlement, at least as between the settling parties. Such an opinion, however, should not disqualify the judge from hearing the subsequent good faith motion under Code of Civil Procedure section 877.6. Under this statute, the judge is not required to determine whether the settlement is reasonable between the settling parties, but rather, he is required to determine whether the settlement is reasonable vis-à-vis the nonsettling defendants. "[The] good faith of the dismissal alone is not sufficient. The dismissal must represent . . . a good faith determination of relative liabilities. Only in this situation are both policies behind § 877—equity and settlement—furthered." (*Commercial U. Ins. Co.* v. *Ford Motor Co.* (9th Cir. 1981) 640 F.2d 210, 213.) In short, Judge Davis may not even have considered the good faith question at the settlement conference.

While there may be room for argument as to whether the settlement judge should participate in a subsequent good faith hearing, we note first that the Legislature has not proscribed the practice. Second, two recognized experts on the practical aspects of civil procedure have approved the

practice of the settling judge handling the good faith determination. "[I]f the settlement was reached at a court-supervised settlement conference, it is good practice to request an order setting the [section 877.6] motion for hearing before the settlement judge." (3 Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (1987) § 12:201.4, p. 12-38.6.)

Although we do not necessarily endorse the opinion that the settlement judge should conduct the good faith determination hearing at least from the nonsettling tortfeasor's viewpoint, nevertheless, the bottom line is that if petitioners had wanted a judge unfamiliar with the case to preside over the good faith hearing, they could have made their wishes known. If another judge were not then assigned to hear the good faith question, petitioners would have had the right to file a Code of Civil Procedure section 170.6 disqualification motion against the assigned judge.[3] Instead, it appears that petitioners actually sought out Judge Davis to hear the motion.

For the reasons stated, the trial court did not abuse its discretion in hearing the good faith determination motion.

■ II *Nor did the judge abuse his discretion in finding the settlement was made in good faith.*

■ "[T]he intent and policies underlying section 877.6 require that a number of factors be taken into account including a rough approximation of plaintiffs' total [projected] recovery and the settlor's proportionate liability, the amount paid in settlement, the allocation of settlement proceeds among plaintiffs, and a recognition that a settlor should pay less in settlement than he would if he were found liable after a trial. Other relevant considerations include the financial conditions and insurance policy limits of settling defendants, as well as the existence of collusion, fraud, or tortious conduct aimed to injure the interests of nonsettling defendants. (See *In re MGM Grand Hotel Fire Litigation* (D.Nev. 1983) 570 F.Supp. 913, 927.) Finally, practical considerations obviously require that the evaluation be made on the basis of information available at the time of settlement. '[A] defendant's settlement figure must not be grossly disproportionate to what a reasonable person, at the time of the settlement, would estimate the settling defendant's liability to be.' (*Torres* v. *Union Pacific R.R. Co.* (1984) 157 Cal.App.3d

---

[3] Code of Civil Procedure section 170.6 provides in pertinent part: "(2) Any party to or any attorney appearing in any . . . action or proceeding [involving a contested issue of fact or law] may [disqualify a judge] by an oral or written motion without notice supported by affidavit or declaration under penalty of perjury or an oral statement under oath that the judge, . . . before whom such action or proceeding is pending or to whom it is assigned is prejudiced against any such party or attorney or the interest of such party or attorney so that such party or attorney cannot or believes that he cannot have a fair and impartial trial or hearing before such judge, . . ."

499, 509 ....) The party asserting the lack of good faith, who has the burden of proof on that issue (§ 877.6, subd. (d)), should be permitted to demonstrate, if he can, that the settlement is so far 'out of the ballpark' in relation to these factors as to be inconsistent with the equitable objectives of the statute. Such a demonstration would establish that the proposed settlement was not a 'settlement made in good faith' within the terms of section 877.6." (*Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates, supra,* 38 Cal.3d 488, 499-500, fn. omitted.)

■ Petitioners' basic argument is that the $50,000 settlement was grossly disproportionate to Western Farm's potential liability because Western Farm is 100 percent liable but will pay only about 15 percent of the potential damages of roughly $325,000.[4] The argument falls because of its false percentage assumptions.

If Western Farm is 100 percent liable for plaintiffs' damages, the obvious implication is that petitioners have zero liability, i.e., they were not negligent in either mixing or applying the pesticide. However, this self-serving conclusion is entitled to no weight, particularly in light of the plaintiffs' evidence describing an easily conducted reagent test through which petitioners could have checked the pesticide mix for the presence of free copper before its application to plaintiffs' trees. Free copper in the mix would have indicated the need for additional hydrated lime. Thus a jury could find that petitioners were actively negligent in the mixing and application of the pesticide. (Further support for a finding of potential liability of petitioners is found in Mr. Lane's offer to settle with plaintiffs, made at the good faith hearing, for 10 percent ($16,305) of Lane's assessment of plaintiffs' total damages of $163,038.86.)

The assertion that $50,000 represents only about 15 percent of plaintiffs' total potential damages is also based on a false assumption, i.e., that plaintiffs were actually damaged in the sum of at least $325,000. This amount merely reflects what plaintiffs claimed they were damaged. ■ In determining a settling defendant's equitable proportionate share of liability, the judge does not look to the plaintiff's claim for damages; rather the judge tries to determine a "rough approximation" of what the plaintiff would actually recover if the case should go to trial. (*Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates, supra,* 38 Cal.3d at p. 501, quoting from *Kohn* v. *Superior Court* (1983) 142 Cal.App.3d 323, 328 [191 Cal.Rptr. 78]: " '[a]lthough the sums paid may be grossly disproportionate to the sums prayed for in the

[4] This amount apparently comes from plaintiffs' settlement conference statement which alleges "as a result of the copper damage to the quality of the fruit in 1981, the plaintiffs suffered a net crop loss in 1981 of $72,020.04 and experienced a catastrophic loss in yield in 1982 resulting in a net loss of $251,879.27.

complaint, they are not out of proportion to what the trial court might have considered the probable recovery of plaintiffs should they prove their case.'" (Fn. omitted.)) This amount is then discounted for settlement purposes based on the savings in trial time, defense costs, attorneys' fees and the avoidance of the risk inherent in every trial of a verdict or judgment larger than expected. Here, the judge observed that he was "not convinced by a long shot that this is a $320,000 case or $150,000 [case] for that matter." The judge expressed several times his doubts as to plaintiffs' ability to prove the $320,000 claimed in damages, due to evidence contained in Western Farm's settlement conference statement tending to show that factors other than the pesticide may have caused the crop losses. Petitioners' own settlement statement cites additional evidence tending to shift responsibility for the crop damage to other causes, including plaintiffs' own negligence. ▮ Judge Davis's evaluation of plaintiffs' case as being worth less than $150,000 is therefore supported by the record. This being so, the $50,000 settlement is not "out of the ballpark" even for a tortfeasor shouldering more than 50 percent of the liability. As observed in *Tech-Bilt, supra,* "a settler should pay less in settlement than he would if he were found liable after a trial"—a policy clearly intended to promote settlements. (38 Cal.3d at p. 499.)

▮ Petitioners argue that Judge Davis improperly referred to the fact that Western Farm was a self-insured organization. Judge Davis observed: "Now, let me just say by way of the financial condition of the two parties, I know that Western Farm Service is not a small organization. I also recognize the fact that they are self-insured.

"The very presence of Mr. Lane here on behalf of Horton and Crumbliss of course indicates to me that there is insurance all the way from Dan to Beersheba. And I also realize that sometimes self-insured companies think differently than insurance companies." Petitioners contend that the judge's reasoning was improper since it suggests that "petitioner should face a greater exposure because defendant Western Farm Service was self-insured." *Tech-Bilt, supra,* states that in determining the proportionality of a settlement "[o]ther relevant considerations include the financial conditions and insurance policy limits of settling defendants, ..." (38 Cal.3d at p. 499.) Judge Davis's comments were within the scope of the *Tech-Bilt* language and constituted proper comments by the judge. Western Farm's financial condition should be viewed in the context of the proposed settlement, its potential liability should the settlement fail, and the financial effect on it of an adverse judgment after trial. The judge was properly concerned with a defendant's ability to pay, a question inextricably linked with the question of insurance coverage.

Self-insured defendants *do* think differently than insurers. They may be more willing to settle than if they had insurance because an insurance company is usually in a far better position financially to defend a lawsuit through a trial and possible appeal. That willingness may translate into a slightly higher settlement than would otherwise be obtained by the plaintiff. Moreover, the higher the policy limit, the less of a settlement the insured defendant will have to pay out of pocket whereas here, Western Farm is self-insured and all of the settlement comes from their pocket. Thus, a trial court should be permitted to consider the presence or absence of insurance even for a large financially secure organization.

Petitioners also make a serious charge that the settlement was made to enable plaintiffs to suppress evidence harmful to their case against petitioners. As noted in *Tech-Bilt, Inc., supra,* evidence of the existence of fraud or collusion "aimed to injure the interests of nonsettling defendants" is to be considered in evaluating the good faith of the settlement. (38 Cal.3d at p. 499.) The specific evidence allegedly suppressed is the expert testimony of one John Marcroft, Western Farm's causation expert. Following the good faith hearing on December 12, 1986, Western Farm withdrew all of its experts, including Marcroft, from the case, thereby returning Marcroft to his status as a consultant for Western Farm and rendering his opinion on liability subject to the work product privilege. Mr. Lane, petitioners' attorney, claims in his declaration that Western Farm's counsel, Dale Dorfmeier, told Lane at the conclusion of the good faith hearing that "one of the inducements to plaintiffs in settling with Western Farm Service was to avoid the testimony of John Marcroft, defendants' designated expert on causation." Mr. Dorfmeier categorically disputes this allegation by stating in his declaration that there "was no predetermined plan, discussion, collusion, or other arrangement whatsoever [to suppress Marcroft's testimony] with the plaintiffs' attorney." Dorfmeier explains that it was not until the hearing on the good faith motion—more than three weeks after the settlement conference—when Mr. Lane first took an "adversarial position to Western Farm by asserting that it was 100 percent liable for any damages," that Dorfmeier decided to withdraw Marcroft as his expert witness.

Ralph Wyatt, counsel for plaintiffs, states in his declaration that "at no time prior to, during or after the settlement conference" did he ever or to his knowledge did anyone else acting on behalf of his client make it a term or condition of the $50,000 settlement with Western Farm to suppress the testimony of John Marcroft or any other expert. Mr. Wyatt further declares that he has agreed "both orally and in writing" that the plaintiffs would not object to the petitioners' filing an untimely amended designation of experts to designate John Marcroft as an expert so long as the plaintiffs are afforded

an opportunity to depose Marcroft before trial. Wyatt then alleges the petitioners filed such an amended designation.[5]

■ We first believe that petitioners have waived their contention about the suppression of Marcroft's testimony by their failure to move for reconsideration of the order determining the good faith of the settlement. Code of Civil Procedure section 1008, subdivision (a) provides "When an application for an order has been made to a judge, ... and refused in whole or in part, or granted, ... *any party* affected by the order may, within ten (10) days after knowledge of the order and based upon an alleged different state of facts may, make application to the same judge who made the order, to reconsider the matter and modify, amend or revoke the prior order." (Italics added.) According to Mr. Lane, he was advised by Mr. Dorfmeier on December 12, 1986, following the hearing on the motion to determine good faith, that "one of the inducements to the plaintiff" in settling with Western Farm was to avoid Marcroft's testimony. Mr. Lane then had 10 days from December 12 within which to move for reconsideration by Judge Davis of the good faith order and to present whatever new evidence he had on that question. We view the failure to so move as a waiver of the right to assert the point in this mandamus proceeding.

■ Even if we were to treat the issue here, the declarations of the attorneys who actually participated in the settlement negotiations (Wyatt and Dorfmeier) make it clear that no agreement was made to suppress Marcroft's testimony. Taking Mr. Lane's declaration at face value, i.e., that one of the inducements *to plaintiffs* in settling with Western Farm was to avoid the testimony of Marcroft, does not establish that the inducement was agreed to by Mr. Dorfmeier as a condition of the settlement. Thus, if this court were to independently evaluate counsel's declarations as to what transpired below, we would reject petitioners' contention.

■ Petitioners' final argument against the good faith finding is grounded on the plaintiffs' offer to settle their case with petitioners for $100,000 after the good faith hearing. Plaintiffs had initially offered to settle with petitioners for $35,000. This was refused, but at the settlement conference petitioners counteroffered $5,000, which plaintiffs refused. Then, at the good faith hearing, petitioners' attorney offered $16,303.89. Plaintiffs then made their counteroffer to settle for $100,000.

Plaintiffs' counsel indicates that the $100,000 offer was prompted by his conclusion that petitioners had "engaged in bad faith settlement

---

[5] While this arrangement will obviate any prejudice to petitioners at the trial with plaintiffs insofar as Marcroft's testimony is concerned, it does not resolve the question of the good faith of plaintiffs' settlement with Western Farm.

negotiations at the settlement conference... by offering only $5,000 ... when in fact they had assessed their exposure at 10 percent of $163,038.86."

While we do not purport to comprehend the motives behind the offers and counteroffers which were made in this case, we find no basis for vitiating the settlement because of the $100,000 offer. Petitioners have the burden of proof on the issue of good faith. (Code Civ. Proc., § 877.6, subd. (d).) They have not shown that they met their burden before the trial court.

III. *The judge did not abuse his discretion in dismissing petitioners' cross-complaint for total equitable indemnity.*

Petitioners' cross-complaint contains two causes of action: one for partial or comparative indemnity, the other apparently for complete indemnity and declaratory relief. The cause of action for comparative indemnity is barred by the trial court's good faith determination. (*American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578, 603-604 [146 Cal.Rptr. 182, 578 P.2d 899].)

Whether a cross-complaint for total equitable indemnity is barred by a good faith settlement is a question creating sharp conflicts in the appellate courts. Of those courts addressing the question in published opinions, seven have found that a good faith settlement bars total equitable indemnity. Among these are Divisions Three and Four of the First District (*Kohn* v. *Superior Court, supra,* 142 Cal.App.3d 323; *IRM Corp.* v. *Carlson* (1986) 179 Cal.App.3d 94 [224 Cal.Rptr. 438]); Divisions Two, Three and Seven of the Second District (*Turcon Construction, Inc.* v. *Norton-Villiers, Ltd.* (1983) 139 Cal.App.3d 280 [188 Cal.Rptr. 580]; *Far West Financial Corp.* v. *D&S Co.* (1987) 189 Cal.App.3d 1322 [234 Cal.Rptr. 771] review granted June 3, 1987 (S000606); *Torres* v. *Union Pacific R.R. Co.* (1984) 157 Cal.App.3d 499 [203 Cal.Rptr. 825]; the Third District (*City of Sacramento* v. *Gemsch Investment Co.* (1981) 115 Cal.App.3d 869 [171 Cal.Rptr 764]); and Division One of the Fourth District (*Lopez* v. *Blecher* (1983) 143 Cal.App.3d 736 [192 Cal.Rptr. 190]; *Standard Pacific of San Diego* v. *A. A. Baxter Corp.* (1986) 176 Cal.App.3d 577 [222 Cal.Rptr. 106]). A minority of three courts have reached the conclusion that a cause of action for total equitable indemnity does survive a good faith settlement. These include Division Five of the Second District (*Huizar* v. *Abex Corp.* (1984) 156 Cal.App.3d 534 [203 Cal.Rptr. 47]; and Divisions Two and Three of the Fourth District (*E. L. White, Inc.* v. *City of Huntington Beach* (1982) 138 Cal.App.3d 366 [187 Cal.Rptr. 879]; *Angelus Associates Corp.* v. *Neonex Leisure Products, Inc.* (1985) 167 Cal.App.3d 532 [213 Cal.Rptr. 403]; *Tulco, Inc.* v. *Narmco Materials, Inc.,* (1987) 191 Cal.App.3d 116 [213 Cal.Rptr. 403] review granted July 2, 1987 (S001003)).

Until the Supreme Court resolves the issue, we will adopt the majority view, i.e., that "total equitable indemnity" now exists only as "one end of the spectrum of comparative equitable indemnification" (*Standard Pacific of San Diego* v. *A. A. Baxter Corp., supra,* 176 Cal.App.3d at p. 588); hence, there is no reason to distinguish between the two concepts in deciding whether or not a good faith settlement bars indemnification. (See generally, Comment, *Total Equitable Indemnity Under Comparative Negligence: Anomaly or Necessity?* (1986) 74 Cal.L.Rev. 1057.)

The petition for writ of mandate is denied.

Brown, (G. A.) P. J., and Best, J., concurred.