[No. S000606. Sept. 15, 1988.]

FAR WEST FINANCIAL CORPORATION et al., Cross-complainants and Appellants, v.
D & S COMPANY, INC., et al., Cross-defendants and Respondents.

COUNSEL

Roy G. Weatherup, Peter Q. Ezzell, Kenneth C. Byrne, Joseph R. Zamora and Haight, Dickson, Brown & Bonesteel for Cross-complainants and Appellants.

Melvin F. Seifert, Carol A. Stroup, Ives, Kirwan & Dibble, Kelley K. Beck, Michael M. Youngdahl, Hawkins, Schnabel & Lindahl, Galen F. Griepp, Kegel, Tobin, Hamrick & Truce, Mario A. Iorillo, Steven M. Karp, Iorillo & Karp, David B. Pillemer, Mandel, Meininger, Pillemer & Schwab, Mandel, Pillemer & Schwab, Paul F. Sowa, Stockdale, Peckham & Werner, Mark D. Rutter, Buck, Molony & Ammirato, Jonathan G. Maile, Christopher S. Maile, Tharpe & Howell, William C. Howison, Williams, Berges & Sanford, Steven R. Jensen and Barmasse & Cohen for Cross-defendants and Respondents.

## OPINION

**ARGUELLES, J.**—California has adopted a variety of statutes to promote the voluntary settlement of litigation. One of these provisions, section 877.6, subdivision (c) of the Code of Civil Procedure,[1] provides that when a defendant in a tort action enters into a settlement agreement with the plaintiff and the trial court determines that the settlement was made in "good faith," the trial court's good faith determination "shall bar any other joint tortfeasor from any further claims against the settling tortfeasor for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault." The issue presented here is whether, under this statutory scheme, a defendant who has entered into a good faith settlement remains vulnerable to a claim by a nonsettling defendant for "total equitable indemnity," or whether such a claim is covered by the statute and is barred by the good faith settlement.

The great majority of Court of Appeal decisions which have addressed this question have concluded that a claim for total equitable indemnity, like other equitable indemnity claims, is barred by a good faith settlement.[2] A few Court of Appeal decisions, however, have ruled that a claim for total equitable indemnity survives such a settlement.[3] We granted review to resolve this conflict.

---

[1] Unless otherwise stated, all section references are to the Code of Civil Procedure.

[2] *City of Sacramento* v. *Gemsch Investment Co.* (1981) 115 Cal.App.3d 869 [171 Cal.Rptr. 764]; *Turcon ·Construction, Inc.* v. *Norton-Villiers, Ltd.* (1983) 139 Cal.App.3d 280 [188 Cal.Rptr. 580]; *Kohn* v. *Superior Court* (1983) 142 Cal.App.3d 323 [191 Cal.Rptr. 78]; *Lopez* v. *Blecher* (1983) 143 Cal.App.3d 736 [192 Cal.Rptr. 190]; *Standard Pacific of San Diego* v. *A. A. Baxter Corp.* (1986) 176 Cal.App.3d 577 [222 Cal.Rptr. 106]; *IRM Corp.* v. *Carlson* (1986) 179 Cal.App.3d 94 [224 Cal.Rptr. 438]; *Horton* v. *Superior Court* (1987) 194 Cal.App.3d 727, 739 [238 Cal.Rptr. 467].

[3] *Huizar* v. *Abex Corp.* (1984) 156 Cal.App.3d 534 [203 Cal.Rptr. 47]; *Angelus Associates Corp.* v. *Neonex Leisure Products, Inc.* (1985) 167 Cal.App.3d 532 [213 Cal.Rptr. 403].

As we shall explain, in light of both the legislative history and the fundamental purposes of section 877.6, subdivision (c), we agree with the majority of Court of Appeal decisions that the statute must properly be interpreted as barring nonsettling tortfeasors from pursuing a claim for total equitable indemnity against a defendant who has entered into a good faith settlement. A contrary conclusion would leave a defendant who has entered into a good faith settlement vulnerable to further litigation and additional liability in many cases and would thereby substantially impair the statutory objective of promoting voluntary settlements. Furthermore, as we shall see, this interpretation of the provision does not place a unique or undue burden on the rights of defendants seeking total equitable indemnity, for the interests of such defendants—like the interests of all other defendants who may potentially be harmed by a proposed settlement agreement—may be properly protected through the trial court's determination of whether the proposed settlement agreement satisfies the statutory "good faith" requirement.

Because the Court of Appeal in the case at bar correctly interpreted the statute, we affirm the judgment.

I

In 1972, Far West Financial Corporation, a real estate developer involved in the financing and developing of condominiums in Los Angeles County,[4] entered into a contract with D & S Company, Inc. (D & S), a general contractor, for the building of a condominium project, the Studio Village Townhouse Development, in Los Angeles County. The project was apparently completed in the mid-1970's.

Shortly after the completion of the project and the sale of the condominiums to private owners, a number of defects in the common areas of the project appeared. In response to complaints by the homeowners, Far West, the developer and seller of the units, made some repairs. In October 1976, the Studio Village Homeowners Association (hereafter the Association or plaintiff) and Far West entered into a settlement and release agreement in which Far West agreed to make a number of additional specified repairs and to pay the Association $22,750 in return for the Association's agreement to release Far West from any further liability for defects in the project.

---

[4] Far West Financial Corporation is a holding company incorporated in Delaware and licensed to do business in California. Far West Savings and Loan Association, the successor in interest to State Mutual Savings and Loan Association, is a California subsidiary of Far West Financial Corporation and is engaged in the business of financing and developing condominiums. Both entities have been joined as defendants in this action and, for convenience, both will be referred to collectively as Far West.

Several years later, after a heavy rainstorm season in 1977-1978, many additional, serious defective conditions—which had previously been latent—became evident, affecting the roof, ground drainage, underground plumbing, area lighting, building settlement, painting and exterior of the project. In response to the appearance of these serious defects, the Association filed the present action in December 1979 against Far West, D & S, and numerous subcontractors, engineering firms and architects who had worked on the project.

The Association's third amended complaint, filed in October 1980, sought to set aside the earlier release agreement between the Association and Far West and sought recovery against various defendants on theories of (1) fraudulent concealment of the defects at the time of the initial settlement agreement, (2) negligent and intentional misrepresentation, (3) strict liability, (4) breach of express and implied warranties, (5) negligence, and (6) fraud and deceit.

In July 1981, after answering the complaint, Far West filed a cross-complaint against D & S and various Doe defendants, seeking either "complete indemnification from or partial contribution from" those defendants. Far West claimed that D & S had exercised complete control over the construction of the project and that if there were any deficiencies in the construction, such defects were directly attributable to D & S or to the subcontractors D & S had hired and supervised. Thereafter, D & S and a number of the other defendants filed their own indemnity cross-complaints against each other and against Far West.

During the summer of 1983, one of the defendants, structural engineers who had worked on a portion of the underground construction, settled with plaintiff for $100,000. On motion the trial court found the settlement in good faith and dismissed the cross-complaints against that defendant.

In early 1984, Far West and plaintiff entered into a settlement agreement under which Far West paid plaintiff $315,000 outright and provided a sliding scale guaranty of an additional $35,000 recovery, in return for plaintiff's agreement to release Far West from any further liability. On Far West's motion, the trial court found the settlement to be in good faith and dismissed the numerous indemnity cross-complaints which were then pending against Far West. Although the actions against Far West had been dismissed, Far West continued to pursue its own cross-complaint against the remaining defendants seeking indemnification of the $315,000 it had paid to plaintiff. It is clear under existing precedent that Far West had the right to continue to seek indemnification in this manner (see, e.g., *Sears, Roebuck & Co.* v. *International Harvester Co.* (1978) 82 Cal.App.3d 492,

496 [147 Cal.Rptr. 262]; *Bolamperti* v. *Larco Manufacturing* (1985) 164 Cal.App.3d 249, 255 [210 Cal.Rptr. 155]), and no party challenges Far West's indemnity claim in this respect.

In August 1984, in accordance with the suggestions of a settlement judge at a voluntary settlement conference, D & S and a number of subcontractors (hereafter sometimes referred to as the D & S defendants) entered into a settlement agreement (hereafter sometimes referred to as the D & S settlement) with plaintiff under which the D & S defendants agreed to pay plaintiff $450,000 in return for a release of plaintiff's claims against them. The settlement agreement was conditioned on (1) the trial court's determination that the settlement was in good faith and (2) the dismissal of all outstanding cross-complaints against the D & S defendants.

On September 4, 1984, the D & S defendants moved for an order under section 877.6 declaring the settlement agreement in good faith and dismissing all of the cross-complaints pending against them. On September 14, Far West filed a partial opposition to the D & S defendants' motion; in that opposition, Far West did not challenge the good faith nature of the D & S settlement, but simply opposed the D & S defendants' request for an order dismissing Far West's cross-complaint for indemnification against such defendants. Far West contended that under section 877.6 a good faith settlement does not operate to bar a claim for complete or total indemnity, as contrasted with a claim for partial indemnity or contribution, and it maintained that its cross-complaint sought total indemnity from D & S and the other defendants who were parties to the $450,000 settlement. On that same date, September 14, 1984, Far West also filed a separate motion, seeking leave to file a second amended cross-complaint in which it proposed to add claims for express contractual indemnity and implied contractual indemnity to its previous claim for "complete indemnification . . . or partial contribution."

The D & S defendants' motion for a good faith determination came on for hearing on September 21, 1984. After considering the parties' contentions, the trial court—without specifically passing on Far West's motion for leave to file an amended cross-complaint—found the D & S settlement to be in good faith and dismissed all of the cross-complaints, including Far West's cross-complaint, against the settling defendants. Two weeks later, on October 4, the trial court heard and denied Far West's request for leave to file an amended cross-complaint, noting the belated nature of the request. On October 15, the court entered a formal order finding the D & S settlement in good faith and dismissing all cross-complaints against the parties to that agreement.

■ Far West appealed the dismissal of its cross-complaint, contending, inter alia, that insofar as the cross-complaint embodied a claim for total equitable indemnity it could not be extinguished by a good faith settlement and should not have been dismissed. The Court of Appeal, while noting the conflict in prior Court of Appeal decisions on the issue, found the position reached in the majority of decisions persuasive and followed those decisions in concluding that even if Far West could properly maintain an action for total equitable indemnity on the facts of this case, such a claim was properly barred by the trial court's determination that the D & S settlement agreement was a good faith settlement within the meaning of section 877.6.

As noted, we granted review to resolve the conflict in the Court of Appeal decisions on this question.[5]

## II

### A.

■ Section 877.6, subdivision (c) provides in relevant part that when an alleged tortfeasor enters into a settlement agreement with the plaintiff "[a] determination by the court that the settlement was made in good faith *shall bar any other joint tortfeasor . . . from any further claims against the settling tortfeasor . . . for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault.*" (Italics added.)[6]

---

[5] In addition to rejecting Far West's contention with regard to the effect of a good faith settlement on a claim for total equitable indemnity, the Court of Appeal rejected Far West's claim that the trial court had abused its discretion in denying Far West's motion for leave to file a second amended cross-complaint to add claims for implied and express contractual indemnity. The Court of Appeal determined that the trial court properly found that Far West had provided no adequate explanation for its eleventh-hour request for leave to amend and that Far West's delay had prejudiced the other parties who had spent considerable time and effort in negotiating a settlement agreement with knowledge only of Far West's prior cross-complaint.

Far West's statement of issues in its petition for review did not seek review of this aspect of the Court of Appeal's ruling and, under the circumstances, we see no reason to disturb the Court of Appeal's conclusion. As a consequence, we have no occasion in this case to determine whether an indemnity claim resting on an implied contract theory or arising from an express indemnification agreement is barred by a good faith settlement. We note that there is a split in Court of Appeal decisions with respect to the implied contractual indemnification question (compare *IRM Corp.* v. *Carlson, supra,* 179 Cal.App.3d 94, 109-110 [claim barred] and *Stratton* v. *Peat, Marwick, Mitchell & Co.* (1987) 190 Cal.App.3d 286, 292 [235 Cal.Rptr. 374] [same] with *County of Los Angeles* v. *Superior Court* (1984) 155 Cal.App.3d 798, 803 [202 Cal.Rptr. 444] [claim not barred] and *Bear Creek Planning Com.* v. *Title Ins. & Trust Co.* (1985) 164 Cal.App.3d 1227, 1239 [211 Cal.Rptr. 172] [same]), and the issue is presented in another matter currently pending in our court. (*Bay Development Ltd.* v. *Superior Court,* S000888.)

[6] In an amendment effective January 1, 1988, the Legislature has extended the reach of section 877.6, subdivision (c) to co-obligors on a contract debt, providing that a good faith set-

Far West contends that because the statute does not expressly refer to claims for "total indemnity," the provision should not be interpreted to prohibit a nonsettling party, who may be only vicariously or derivatively liable for a plaintiff's injury, from pursuing a claim for total equitable indemnity against a directly or primarily responsible tortfeasor, even if a trial court has found that such a tortfeasor's settlement with the plaintiff satisfies the "good faith" requirement of section 877.6. The D & S defendants, in turn, contend that the terms "equitable comparative contribution, or partial or comparative indemnity" in section 877.6, subdivision (c), were intended to refer to the entire spectrum of claims pursued under California's current common law equitable indemnity doctrine, and that, in light of both the history and purposes of the provision, no distinction may properly be drawn between claims for total equitable indemnity and all other claims for equitable indemnity so as to leave defendants who have entered into good faith settlements subject to claims for total equitable indemnity.

As the division in the past Court of Appeal decisions on this subject suggests (see fns. 2, 3, *ante*), the language of section 877.6 is, on its face, reasonably susceptible to either of the suggested interpretations. Although the statute does not expressly refer to "total indemnity" claims, the section does expressly apply to "partial *or comparative*" indemnity claims; if the Legislature clearly intended the section to apply only to claims seeking partial indemnity, the reference to "comparative" indemnity could be viewed as superfluous. In context, the issue before us cannot properly be decided by reference to the "plain language" of the statute itself.[7] Rather, to resolve the question, it is necessary to consider the background and legislative history of the provision and to assess which interpretation is most compatible with the legislative purposes of the measure.

tlement by one co-obligor bars any further claim by any co-obligor against the settling party. (Stats. 1987, ch. 677, § 3, p. __.) The amendment has no application to this case.

[7] Contrary to the suggestion of the Court of Appeal in *Angelus Associates Corp.* v. *Neonex Leisure Products, Inc., supra,* 167 Cal.App.3d 532, 541, there is no legitimate basis for concluding that an indemnity action between a vicariously or derivatively liable tortfeasor and a directly liable tortfeasor is not encompassed within section 877.6, subdivision (c) on the theory that such an action is not "based on comparative negligence or comparative fault." As our court made clear in *Daly* v. *General Motors Corp.* (1978) 20 Cal.3d 725, 736 [144 Cal.Rptr. 380, 575 P.2d 1162]—in holding that comparative fault principles could appropriately be applied to reduce the liability of a strictly liable defendant when a plaintiff's negligence had contributed to the injury—the terms "comparative negligence" or "comparative fault" "do not, standing alone, lend themselves to the exact measurements of a micrometer-caliper, or to such precise definition as to divert us from otherwise strong and consistent countervailing policy considerations." (20 Cal.3d at p. 736.) Indeed, in *Daly* itself, we suggested that "the term 'equitable apportionment or allocation of loss' may be more descriptive than 'comparative fault.' " (*Ibid.*) Thus, we have never viewed the "comparative fault" terminology as so restrictive as to exclude the equitable allocation of loss between vicariously and directly liable tortfeasors. Accordingly, we reject the *Angelus* court's conclusion that the wording of section 877.6, subdivision (c) unambiguously excludes claims for total equitable indemnity from the reach of the provision.

## B.

In *Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates* (1985) 38 Cal.3d 488 [213 Cal.Rptr. 256, 698 P.2d 159] (hereafter *Tech-Bilt*), we reviewed the common law and statutory background of section 877.6, subdivision (c) at some length and explained that, in large part, the provision represents a codification of the principles established by this court's decision in *American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578 [146 Cal.Rptr. 182, 578 P.2d 899] (hereafter *American Motorcycle*). (See *Tech-Bilt, supra,* 38 Cal.3d at pp. 493-496.) Accordingly, we turn initially to the *American Motorcycle* decision.

In *American Motorcycle,* the court addressed, inter alia, the broad question of what effect, if any, the adoption of comparative negligence principles in *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393] should have on California's preexisting common law equitable indemnity doctrine which permitted one tortfeasor to completely shift its liability for an injury to a more culpable tortfeasor under some circumstances. (*American Motorcycle, supra,* 20 Cal.3d at pp. 591-598.) After examining the origins of the equitable indemnity doctrine and the courts' largely unsuccessful struggle to frame an appropriate test "for determining when the relative culpability of the [tortfeasors was] sufficiently disparate to warrant placing the entire loss on one party and completely absolving the other" (*id*. at p. 594), the *American Motorcycle* court ultimately concluded that "the existing California common law equitable indemnity doctrine—while ameliorating inequity and injustice in some extreme cases—suffers from the same basic 'all or nothing' deficiency as the discarded contributory negligence doctrine and falls considerably short of fulfilling *Li*'s goal of 'a system under which liability for damage will be borne by those whose negligence caused it in direct proportion to their respective fault." (*Id*. at p. 591.) As a consequence, the court held in *American Motorcycle* that "the current equitable indemnity rule should be modified to permit a concurrent tortfeasor to obtain partial indemnity from other concurrent tortfeasors on a comparative fault basis." (*Id*. at p. 598.)

At the same time as it modified the common law equitable indemnity doctrine to permit partial indemnity on a comparative fault basis, the *American Motorcycle* court recognized the necessity of dealing with the question of how a tortfeasor's right to pursue a claim for partial or comparative indemnity against another tortfeasor would be affected when the tortfeasor from whom indemnity was sought entered into a settlement agreement with the plaintiff. Relying on the provisions of section 877, subdivision (b)— which dealt with the effect of a settlement in the related area of contribution between tortfeasors—as reflecting a strong state policy in favor of promot-

ing settlement of claims, the *American Motorcycle* court concluded that while "section 877, by its terms, releases a settling tortfeasor only from liability for contribution and not partial indemnity, . . . from a realistic perspective the legislative policy underlying the provision dictates that *a tortfeasor who has entered into a 'good faith' settlement* [citation] *with the plaintiff must also be discharged from any claim for partial or comparative indemnity that may be pressed by a concurrent tortfeasor.*" (Italics added.) (20 Cal.3d at p. 604.) Quoting the observations of the then-recent Court of Appeal decision in *Stambaugh* v. *Superior Court* (1976) 62 Cal.App.3d 231, 236 [132 Cal.Rptr. 843], that "*[f]ew things would be better calculated to frustrate [section 877's] policy, and to discourage settlement of disputed tort claims, than knowledge that such a settlement lacked finality and would lead to further litigation with one's joint tortfeasors, and perhaps further liability,*" the *American Motorcycle* court emphasized that that observation was "as applicable in a partial indemnity framework as in the contribution context." (Italics added.) (*American Motorcycle, supra,* 20 Cal.3d at p. 604.) Accordingly, the *American Motorcycle* court held that, under its decision, a tortfeasor who entered into a good faith settlement with a plaintiff would be free from any claim for partial or comparative indemnity. (*Ibid.*)

Although nothing in *American Motorcycle* suggests that the decision, in modifying the preexisting all-or-nothing equitable indemnity doctrine, intended to create a wholly new legal doctrine, separate and distinct from the old total equitable indemnity doctrine, Far West relies on a footnote in *Safeway Stores, Inc.* v. *Nest-Kart* (1978) 21 Cal.3d 322 [146 Cal.Rptr. 550, 579 P.2d 441], a decision handed down a few months after *American Motorcycle, supra,* 20 Cal.3d 578, to support its claim that "total equitable indemnity" and "comparative equitable indemnity" are separate legal concepts and should not be treated similarly for purposes of section 877.6, subdivision (c).

In *Safeway Stores,* a patron who had been injured by a defective shopping cart sued Safeway and the manufacturer of the cart on negligence and strict product liability theories; the jury found both defendants liable, and apportioned 80 percent of the liability to Safeway and 20 percent to the manufacturer. On appeal, the principal issue before the court was whether "the comparative fault principle . . . should be utilized as the basis for apportioning liability between two tortfeasors, one whose liability rests upon California's strict product liability doctrine and the other whose liability derives, at least in part, from negligence theory." (21 Cal.3d at p. 325.) The *Safeway Stores* court recognized that some commentators had suggested that there was "a fundamental doctrinal obstacle" to the application of the comparative fault principle in this context "in that no logical basis can be found for comparing the relative 'fault' of a negligent defendant with that of

a defendant whose liability rests on the 'no fault' concept of strict product liability." (*Id.* at p. 331.) Nonetheless, the *Safeway Stores* court—relying on the then-recent decision in *Daly* v. *General Motors Corp., supra,* 20 Cal.3d 725, 742, which had concluded that comparative fault principles should apply in assessing the liability of a strictly liable defendant to a negligent plaintiff—rejected the objections to the application of the comparative indemnity doctrine in this context, explaining that "the suggested difficulties are more theoretical than practical" (*Safeway Stores, supra,* 21 Cal.3d at p. 331), and pointing out that "experience in other jurisdictions demonstrates that juries are fully competent to apply comparative fault principles between negligent and strictly liable defendants." (*Ibid.*)

In the course of the *Safeway Stores* opinion, the court observed in a footnote that "[i]n the instant case the jury found that Safeway was itself negligent in failing to safely maintain its carts, and thus Safeway's liability is in no sense solely derivative or vicarious. *Accordingly, we have no occasion to determine in this case whether the comparative indemnity doctrine should be applied in a situation in which a party's liability is entirely derivative or vicarious in nature.* [Citations.]" (Italics added.) (21 Cal.3d 322, 332, fn. 5.) Far West relies heavily on the emphasized language as suggesting that the comparative indemnity doctrine may be distinct from the total indemnity doctrine, and as leaving open the question whether the pre-*American Motorcycle* total equitable indemnity doctrine, rather than the comparative indemnity doctrine, should apply to a case in which one tortfeasor's liability is entirely derivative or vicarious in nature. Although this footnote may provide some oblique support for Far West's position, the footnote clearly did not purport actually to decide whether the total indemnity doctrine had survived the *American Motorcycle* decision (*supra,* 20 Cal.3d 578) as a distinct doctrine, and certainly did not address the further question—the question at issue in the present case—whether an action for total equitable indemnity would be impervious to the effect of a good faith settlement.

Less than two years after the *Safeway Stores* decision, our court, in the course of an opinion which considered when an action for comparative indemnity accrues, did speak directly to the question of whether the *American Motorcycle* decision (*supra,* 21 Cal.3d 322), intended the comparative indemnity doctrine to constitute the basis for a new legal claim, distinct from the pre-*American Motorcycle* total equitable indemnity action. In *People* ex rel. *Dept. of Transportation* v. *Superior Court* (1980) 26 Cal.3d 744 [163 Cal.Rptr. 585, 608 P.2d 673], we explained: "[T]he *American Motorcycle* decision clearly reveals that this court did not purport to create a wholly new equitable indemnity action resting on a different theoretical basis than the pre-*American Motorcycle* equitable indemnity doctrine. . . . [¶] [In *American Motorcycle*] we concluded that in order to bring the California

equitable indemnity doctrine into line with its historical and theoretical foundations 'the current equitable indemnity rule should be modified to permit a concurrent tortfeasor to obtain partial indemnity from other concurrent tortfeasors on a comparative fault basis.' Thus, *American Motorcycle* did not establish a new cause of action separate and distinct from the traditional equitable indemnity action, but simply modified the all-or-nothing aspect of the pre-*American Motorcycle* doctrine to permit partial indemnification in appropriate cases." (26 Cal.3d at pp. 756-757 [citations omitted].)

■    Thus, *People* ex rel. *Dept. of Transportation, supra,* 26 Cal.3d 744, makes it clear that after *American Motorcycle, supra,* 20 Cal.3d 578, there are not two separate equitable indemnity doctrines in California, but a single "comparative indemnity" doctrine which permits partial indemnification on a comparative fault basis in appropriate cases. To be sure, there is nothing in either *American Motorcycle* or *People* ex rel. *Dept. of Transportation* which suggests that it would necessarily be improper, in a comparative indemnity action, for a trier of fact to determine that the facts and equities in a particular case support a complete shifting of a loss from one tortfeasor to another, rather than, for example, a 60 percent/40 percent or 95 percent/5 percent division of the loss. (Cf. *E. L. White, Inc.* v. *City of Huntington Beach* (1982) 138 Cal.App.3d 366, 373-377 [187 Cal.Rptr. 879].)[8] Even when such a total shift of loss may be appropriate, however, the indemnitee's equitable indemnity claim does not differ in its fundamental nature from other comparative equitable indemnity claims. Accordingly, we think the Court of Appeal in *Standard Pacific of San Diego* v. *A. A. Baxter Corp., supra,* 176 Cal.App.3d 577, 587-588, properly analyzed the teaching of *People* ex rel. *Dept. of Transportation, supra,* 26 Cal.3d 744, when it observed that "[c]omparative equitable indemnity includes the entire range of possible apportionments, from no right to any indemnity to a right of complete indemnity. Total indemnification is just one end of the spectrum of comparative equitable indemnification."

In July 1980, just a few months after the decision in *People* ex rel. *Dept. of Transportation* was rendered, the Legislature enacted section 877.6. The provision established an orderly procedure to permit a trial court to determine, prior to trial, whether a settlement entered into by one of a number of tortfeasors was made in good faith, and, in subdivision (c), codified *American Motorcycle*'s holding that when such a settlement is determined to be in

---

[8] In *E. L. White, supra,* 138 Cal.App.3d 366, the Court of Appeal concluded that after *American Motorcycle* a vicariously liable tortfeasor could still obtain total indemnity from a concurrent tortfeasor; the *E. L. White* court was not faced with the question, and did not decide, whether a vicariously liable tortfeasor could seek such indemnity from a tortfeasor who had entered into a good faith settlement.

good faith, the settlement absolves the settling defendant of any further liability for "equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault." Although we have found nothing in the legislative history of section 877.6 which indicates whether or not the Legislature had our then-recent decision in *People* ex rel. *Dept. of Transportation, supra,* 26 Cal.3d 744, specifically in mind when it enacted the measure, there is no indication that the Legislature intended to distinguish some equitable indemnity claims from others or intended to leave a defendant who had entered into a good faith settlement vulnerable to a claim for total equitable indemnity.[9] ▇ In light of the clear explanation in *People* ex rel. *Dept. of Transportation* that the *American Motorcycle* decision did not create a new, separate and distinct subclass of equitable indemnity claims but simply modified the traditional doctrine to permit a sharing of loss on a comparative fault basis, it appears reasonable to interpret the reference to claims for "equitable comparative contribution, or partial or comparative indemnity" in section 877.6, subdivision (c), as embodying the entire spectrum of potential equitable indemnity claims. Thus, the background and legislative history of the provision support the interpretation of the statute adopted in the majority of past Court of Appeal decisions.[10]

---

[9] As initially introduced on March 20, 1980, Assembly Bill No. 3425, 1979-1980 Regular Session, which ultimately became section 877.6, did not contain any provision which addressed the substantive effect of a good faith determination, but simply established a procedure by which any party to an action could obtain a hearing on the good faith issue prior to or at the commencement of the trial of the action.

The first version of section 877.6, subdivision (c), was added to the bill in the Assembly on May 7, 1980, and provided simply that the good faith determination would relieve the settling tortfeasor from further claims for "equitable comparative contribution based on comparative negligence or comparative fault." From the Legislative Counsel's Digest of the bill, it appears that the drafters intended by this language simply to codify the effect of a good faith settlement agreement under "[e]xisting law," i.e., the *American Motorcycle* decision (*supra,* 20 Cal.3d 578).

Section 877.6, subdivision (c), was further amended in the Senate on July 1, 1980, but there is nothing in the legislative history to suggest that the expansion of the language to encompass "any further claim . . . for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault," was intended to have any effect other than to more closely track the language used in the *American Motorcycle* decision. The Legislative Counsel's Digest continued to describe the bill as simply "specify[ing] that any party has a right to contest the issue of the 'good faith' of a settlement at a noticed hearing" and did not suggest that the language of subdivision (c) was intended to alter existing law on the effect of a good faith settlement.

[10] The decision in *Mesler* v. *Bragg Management Co.* (1985) 39 Cal.3d 290 [216 Cal.Rptr. 443, 702 P.2d 601], is not contrary to this conclusion. The issue in *Mesler* was whether a plaintiff who had settled with a subsidiary corporation retained the right to proceed against a nonsettling parent corporation which allegedly was the alter ego of the subsidiary. Unlike this case, no party in *Mesler* was attempting to seek an additional recovery from a defendant who had entered into a good faith settlement with the plaintiff, and the *Mesler* court consequently had no occasion to consider the effect of the provisions of section 877.6, subdivision (c), or to address the two lines of Court of Appeal decisions that are at issue in this case.

## C.

■ Furthermore, the purposes which underlie section 877.6, subdivision (c) strongly support an interpretation which would include a claim for total equitable indemnity within the claims that are barred by a good faith settlement. In *Tech-Bilt, supra,* 38 Cal.3d 488, and more recently in *Abbott Ford* v. *Superior Court* (1987) 43 Cal.3d 858 [239 Cal.Rptr. 626, 741 P.2d 124], we explained that the good faith settlement provision of this statute was intended to further two separate objectives: "[1] the encouragement of settlements and [2] the equitable allocation of costs among multiple tortfeasors." (*Tech-Bilt, supra,* 38 Cal.3d at pp. 498-499; *Abbott Ford, supra,* 43 Cal.3d at pp. 871-872.) As *Abbott Ford* indicates, we have not attempted to rank these objectives in a fixed hierarchy but instead have stressed the importance of attempting to harmonize these goals (43 Cal.3d at p. 872, fn. 15), emphasizing that the dual purposes of the provision "would be disserved by an approach which emphasizes one to the virtual exclusion of the other." (*Tech-Bilt, supra,* 38 Cal.3d at p. 499.) As we shall see, in this context the two statutory objectives can be harmonized only by including claims for total equitable indemnity within the aegis of section 877.6, subdivision (c).

### 1.

To begin with, it is evident that the statutory objective of promoting settlement agreements would be impaired by an interpretation of section 877.6, subdivision (c) which leaves a tortfeasor who has entered into a good faith settlement vulnerable to further liability for total equitable indemnity. As noted above, in *American Motorcycle* this court specifically recognized that " '[f]ew things would be better calculated . . . to discourage settlement of disputed tort claims, than knowledge that such a settlement lacked finality and would lead to further litigation with one's joint tortfeasors, and perhaps further liability.' " (*American Motorcycle, supra,* 20 Cal.3d 578, 604 [quoting *Stambaugh* v. *Superior Court, supra,* 62 Cal.App.3d 231, 236].)

---

In the course of its decision, the *Mesler* court referred in passing to section 875, subdivision (f), one of the provisions of the contribution statute enacted in 1957, which states that "[t]his title shall not impair any right of indemnity under existing law." In context, it appears that section 875, subdivision (f), was simply intended to ensure that the 1957 legislation, affording joint tortfeasors a right to contribution, was not interpreted to deprive a tortfeasor of any right to indemnity it enjoyed under the then-existing law.

With the advent of the comparative indemnity doctrine in *American Motorcycle, supra,* 20 Cal.3d 578, and the subsequent adoption of section 877.6, subdivision (c), it appears clear that the Legislature contemplated that section 877.6, subdivision (c), the more recent provision which is specifically addressed to the comparative indemnity context, would govern the effect of a good faith settlement agreement on post-*American Motorcycle* equitable indemnity claims.

That observation is obviously no less true when the "further litigation" which a settling defendant may face is a claim for total equitable indemnity than when the claim is one for contribution or for partial equitable indemnity. Thus, there seems little doubt that the exclusion of claims of total equitable indemnity from the reach of section 877.6, subdivision (c) would create a substantial obstacle to settlement in cases in which a defendant who is contemplating settlement is faced with a claim for total indemnity.

Although Far West does not seriously take issue with the above proposition,[11] it seeks to minimize the effect that its proposed interpretation would have on the settlement of claims generally, arguing that the exclusion of claims for total equitable indemnity from the reach of section 877.6, subdivision (c) would affect only a small proportion of cases and that in such cases it is essential to permit an "innocent" tortfeasor to obtain total indemnity, notwithstanding any good faith settlement, if the second statutory objective—the fair apportionment of loss among multiple tortfeasors—is to be achieved. For a number of reasons, this argument is not persuasive.

First, we cannot agree that an exception for claims for total equitable indemnity will, as a realistic matter, affect as few cases as Far West suggests. As a review of the numerous recent decisions on this issue attests,

---

[11] Justice Kaufman's concurring and dissenting opinion does suggest that an interpretation of section 877.6 which exempts total equitable indemnity claims from the reach of a good faith settlement will actually promote the settlement of cases. The opinion reaches this surprising conclusion by postulating that such a rule would induce vicariously liable tortfeasors to enter into early "full-value" settlements with plaintiffs by providing assurance to such tortfeasors that their right to seek total equitable indemnity would remain intact. The argument on this point is flawed on two levels.

In the first place, it is unrealistic to expect that an allegedly vicariously liable defendant, who believes that a solvent directly liable tortfeasor is likely to be found 100 percent responsible for an injury, will often be willing to enter into a "full-value" settlement with a plaintiff. In contemporary multi-party litigation, it is much more likely that settlements will take the form of piecemeal contributions by individual defendants in some rough approximation to each defendant's likely proportionate responsibility for the plaintiff's damages. In such a setting, the rule proposed by the opinion would clearly have a significant anti-settlement effect, for any defendant facing a claim for total equitable indemnity is unlikely to be willing to go forward with the settlement if he will remain potentially responsible for additional liability even if the trial court finds that his contribution to the settlement is "in the ballpark" of his fair share of liability.

Second, in the event an allegedly vicariously liable tortfeasor *does* wish to proceed along the lines suggested by Justice Kaufman—i.e., if he does wish to enter into an early "full-value" settlement with the plaintiff—there is nothing in the present opinion which would preclude such a tortfeasor from including in the settlement agreement a provision in which the plaintiff—who, by hypothesis, has received a "full-value" settlement—agrees to dismiss his action against the directly liable tortfeasor. Such a dismissal would permit the settling vicariously liable tortfeasor to pursue his total equitable indemnity claim without any risk of encountering a subsequent good faith settlement between the directly liable tortfeasor and the plaintiff. Thus, any alleged pro-settlement benefits which Justice Kaufman suggests his rule would produce are equally available under the interpretation of the statute which we adopt.

claims for total indemnity have been made, and undoubtedly will continue to be made, by nonsettling tortfeasors in a wide variety of contexts, with nonsettling tortfeasors frequently characterizing their potential liability as merely "derivative" or "vicarious" in relation to the allegedly more direct malfeasance of the settling tortfeasor.[12] Although if such total indemnity claims were permitted to proceed to trial the settling defendant might well ultimately succeed in defeating the claim for total indemnity in most instances by demonstrating that the nonsettling tortfeasor's liability was not merely vicarious or derivative, such success would be but a Pyrrhic victory as far as the settlement process is concerned. As explained above, the very fact that the total indemnity claim remained to be litigated despite a good faith settlement would have already taken its toll in discouraging the potential indemnitor from entering into a settlement agreement with the plaintiff in the first place.

Furthermore, even when it is clear from the relationship of the settling and nonsettling defendants that the nonsettling defendant *is* vicariously or derivatively liable for the acts of the settling defendant, that factor alone still provides no assurance that a total shifting of loss is warranted under equitable indemnity principles. To begin with, there are many instances in which a defendant who is vicariously liable for another's acts may also bear some direct responsibility for an accident, either on the basis of its own action—for example, the negligent hiring of an agent—or of its own inaction—for example, the failure to provide adequate supervision of the agent's work. In addition, even when a nonsettling tortfeasor's liability may be wholly vicarious or derivative in nature, it does not invariably follow that equitable considerations will, as a matter of law, always call for the total shifting of loss to the more directly culpable tortfeasor. As the court explained in *Safeway Stores, supra,* 21 Cal.3d 322, in discussing the application of equitable indemnity principles in the product liability context, "even in cases in which one or more tortfeasors' liability rests on the principle of strict liability, fairness and other tort policies, such as deterrence of danger-

---

[12] In *City of Sacramento* v. *Gemsch Investment Co., supra,* 115 Cal.App.3d 869, for example, the city—which owned fruit trees adjacent to, and possessed an easement over, a public sidewalk—sought total equitable indemnity from the owners, lessees and sublessees of the property when it was joined as a defendant with those parties in a suit by a plaintiff who had slipped and fallen on fruit seeds on the sidewalk. In *Kohn* v. *Superior Court, supra,* 142 Cal.App.3d 323, a real estate broker and salesman, who had been sued by one of his customers for failing to disclose fire damage in a house, sought total equitable indemnity against a termite inspector and a contractor who had repaired the fire damage. In *Lopez* v. *Blecher, supra,* 143 Cal.App.3d 736, plaintiff, a Good Samaritan, was injured as the result of the negligent operation of two different vehicles, and the owner of one of the vehicles sought total equitable indemnity from the driver of the other vehicle. In *IRM Corp.* v. *Carlson, supra,* 179 Cal.App.3d 94, a tenant sued for injuries which he suffered when his hand went through a glass shower door, and the landlord sought total equitable indemnity from both the manufacturer of the door and the contractor who had installed the door.

ous conduct or encouragement of accident-reducing behavior, frequently call for an apportionment of liability among multiple tortfeasors." (21 Cal.3d at p. 330. See, e.g., *Ford Motor Co.* v. *Robert J. Poeschl, Inc.* (1971) 21 Cal.App.3d 694, 699 [98 Cal.Rptr. 702] [suggesting that circumstances of that case warranted apportionment of loss between manufacturer and retailer of a defective product], discussed with approval in *American Motorcycle, supra,* 20 Cal.3d 578, 595-597.)[13]

As discussed above, in the *American Motorcycle* decision our court reviewed past judicial attempts to formulate a satisfactory standard for determining under what circumstances liability should be totally shifted from one tortfeasor to another, and found that the task had been largely a futile one. (*American Motorcycle, supra,* 20 Cal.3d at pp. 594-595.) Far West's proposed interpretation of section 877.6, subdivision (c) would reintroduce the intractable problem of attempting to define, through a general formula, the appropriate occasions for total equitable indemnity, one of the key

---

[13] Justice Kaufman, relying on section 876, subdivision (b), maintains that a vicariously liable party is in an entirely different category than any other defendant seeking total equitable indemnity. Section 876, subdivision (b), however, contains no suggestion that a vicariously liable party's indemnity claim is different in kind from any other equitable indemnity claim or that such a claim, unlike all other claims for total equitable indemnity, is immune from the effect of a good faith settlement under section 877.6, subdivision (c). Enacted in 1957 as part of California's initial contribution legislation, at a time when *all* equitable indemnity claims involved loss shifting rather than loss sharing, section 876, subdivision (b) provides no support for Justice Kaufman's argument that section 877.6, subdivision (c) should be interpreted to draw a distinction between different types of total equitable indemnity claims.

Nor does the nature of vicarious liability indicate that the Legislature must have intended—despite the absence of any language in section 877.6, subdivision (c) indicative of such intent—to draw a distinction among total equitable indemnity claims. In many instances—for example, strict product liability—tort law places "direct" liability on an individual or entity which may have exercised due care in order to serve the public policies of a fair allocation of the costs of accidents or to encourage even greater safety efforts than are imposed by the due care standard. (See, e.g., *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 63 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049].) As a leading text on torts explains, the modern justification for vicarious liability closely parallels the justification for imposing liability on the nonnegligent manufacturer of a product: "What has emerged as the modern justification for vicarious liability is a rule of policy, a deliberate allocation of risk. The losses caused by the torts of employees, which as a practical matter are sure to occur in the conduct of the employer's enterprise, are placed upon that enterprise itself, as a required cost of doing business. They are placed upon the employer because, having engaged in an enterprise, which will on the basis of all past experience involve harm to others through the torts of employees, and sought to profit by it, it is just that he, rather than the innocent plaintiff, should bear them; and because he is better able to absorb them, and to distribute them, through prices, rates or liability insurance, to the public, and so to shift them to society, to the community at large." (Prosser & Keeton on Torts (1984) § 69, p. 500 [fns. omitted]. See also 5 Harper et al., The Law of Torts (2d ed. 1986) § 26.1, pp. 5-8 & fns. 12 and 14, § 26.5, pp. 17-22.)

Thus, the fact that a tortfeasor's liability is vicarious does not necessarily distinguish him from other tortfeasors nor does it indicate that the public policies on which tort liability rests justify special dispensation from the good faith settlement rules applicable to other tortfeasors.

problems which the adoption of comparative indemnity was intended to overcome. Because of the uncertainty and lack of clarity inherent in any such formula, if we were to adopt Far West's interpretation of section 877.6, subdivision (c), the practical result would be that in many, if not most, cases a tortfeasor who was contemplating settlement with the plaintiff would have to realistically anticipate that even if its settlement agreement were found in good faith, it would still face continued litigation on a cotortfeasor's total indemnity claim.

Thus, contrary to Far West's suggestion, we believe that, as a practical matter, its proposed interpretation of the statute is likely to discourage settlements in a wide range of cases.

### 2.

Furthermore, even if it were possible to confine the antisettlement effect of its proposed interpretation of the statute to cases in which the nonsettling defendant was in fact entitled to 100 percent indemnity, the second prong of Far West's argument—i.e., that a claim for total indemnity must survive a good faith settlement if the statutory goal of a fair apportionment of loss is to be achieved—is also flawed. This contention fails to take adequate account of the nature of the trial court's "good faith" determination under section 877.6 as explained in this court's decision in *Tech-Bilt, supra,* 38 Cal.3d 488, and the role which the good faith determination plays in furthering the fair-apportionment objective.

In *Tech-Bilt,* we disapproved a number of earlier Court of Appeal decisions which had indicated that a settlement agreement should be found in good faith for purposes of section 877.6 so long as the settling parties had not engaged in any "tortious conduct" toward the nonsettling parties (see, e.g., *Dompeling* v. *Superior Court* (1981) 117 Cal.App.3d 798, 809-810 [173 Cal.Rptr. 38]), concluding instead that "[a] more appropriate definition of 'good faith,' in keeping with the policies of *American Motorcycle* and the statute, would enable the trial court to inquire, among other things, whether the amount of the settlement is within the reasonable range of the settling tortfeasor's proportional share of comparative liability for the plaintiff's injuries." (*Tech-Bilt, supra,* 38 Cal.3d at p. 499.) Accordingly, *Tech-Bilt* held that in determining whether a settlement was made in good faith for purposes of section 877.6, a trial court should consider, among other factors, whether the amount paid in settlement bears a reasonable relationship

to—or, in more colloquial terms, is "in the ballpark" of—the settlor's proportionate share of liability. (*Tech-Bilt, supra,* 38 Cal.3d at pp. 499-500.)[14]

As we explained in our recent decision in *Abbott Ford, supra,* 43 Cal.3d 858, 874: "By requiring a settling defendant to settle 'in the ballpark' in order to gain immunity from contribution or comparative indemnity, the good faith requirement of sections 877 and 877.6 assures that—by virtue of the 'set-off' embodied in section 877, subdivision (a)—the nonsettling defendants' liability to the plaintiff will be reduced by a sum that is not 'grossly disproportionate' to the settling defendant's share of liability, thus providing at least some rough measure of fair apportionment of loss between the settling and nonsettling defendants."

Thus, under *Tech-Bilt, supra,* 38 Cal.3d 488, a vicariously or derivatively liable tortfeasor, like any other minimally culpable tortfeasor, is afforded substantial protection against harm from an unfair settlement between a more culpable tortfeasor and the plaintiff. If the more culpable tortfeasor settles with the plaintiff before the vicariously liable tortfeasor, and if the settlement does not require the more culpable tortfeasor to bear its fair share of the loss, the trial court can find that the settlement is not in good faith and, as a consequence, the settlement will not bar the less culpable tortfeasor from pursuing its equitable indemnity claim against the more culpable tortfeasor.[15]

In similar fashion, if, as in this case, an allegedly vicariously liable tortfeasor has already settled with the plaintiff in order to limit its potential

---

[14] The Court of Appeal decisions which hold that a claim for total equitable indemnity survives a good faith settlement were decided before *Tech-Bilt,* and assumed that a vicariously or derivatively liable tortfeasor had no means of challenging, at the good faith hearing, a settlement in which a clearly culpable defendant attempts "to buy peace too cheaply at the expense of codefendants who are merely vicariously liable." (*Angelus Associates Corp.* v. *Neonex Leisure Products, Inc., supra,* 167 Cal.App.3d 532, 542; *Huizar* v. *Abex Corp., supra,* 156 Cal.App.3d 534, 539, 542. See also *City of Sacramento* v. *Gemsch Investment Co., supra,* 115 Cal.App.3d 869, 879 (Paras, J., dis.) [referring to derivatively liable tortfeasor as "remedyless"].) The assumption on which these cases were premised is clearly no longer viable in light of the *Tech-Bilt* decision.

[15] Contrary to the implications in the concurring and dissenting opinions, nothing in this opinion is intended to foreclose a trial court from concluding, on the facts of a particular case, that a proposed settlement agreement is not in good faith either because an allegedly vicariously liable tortfeasor has been improperly excluded from settlement negotiations or because such a tortfeasor has not been included within the settlement agreement. At the same time, we do reject the suggestion that a proposed settlement agreement may *never* be found to constitute a good faith settlement unless it provides for the total dismissal of any cause of action as to which a nonsettling defendant claims to be only vicariously liable. We believe the trial court which presides over the good faith settlement hearing is in the best position to determine, based on the circumstances of the particular case, whether the terms of a proposed settlement are unfair to a nonsettling defendant who claims that its liability is only vicarious in nature.

liability and has continued to pursue its indemnity claim, the allegedly less culpable tortfeasor retains the right to challenge the good faith of any subsequent settlement by the allegedly more culpable tortfeasor. In assessing the good faith of any such subsequent settlement pursuant to the *Tech-Bilt* factors, the trial court must properly consider, inter alia, whether the proposed settlement is within the reasonable range of the settling tortfeasor's total proportional liability, taking into account the settling tortfeasor's potential liability for indemnity to the allegedly vicariously liable tortfeasor as well as its remaining liability to the plaintiff. (See *Standard Pacific of San Diego* v. *A. A. Baxter Corp., supra,* 176 Cal.App.3d 577, 589.)[16] If the trial court determines that the proposed settlement is not within the reasonable range of the settling tortfeasor's proportional liability and would leave the less culpable tortfeasor to bear an unfair share of the loss, the trial court may withhold its good faith imprimatur, and the less culpable tortfeasor will be able to proceed with its equitable indemnity claim.[17]

It is true, of course, that under the *Tech-Bilt* approach a nonsettling tortfeasor may be left to bear some portion of the plaintiff's loss, even in situations in which, if the indemnity claim had gone to trial, the trier of fact might have concluded that the equities supported a total shifting of loss to the more culpable tortfeasor. This follows from *Tech-Bilt*'s recognition (1) that a settlement may be found in good faith even if the settling tortfeasor does not pay a sum precisely commensurate with its proportionate share of liability (*Tech-Bilt, supra,* 38 Cal.3d at p. 499) and (2) that it is appropriate that a settling defendant "pay less in settlement than he would if he were found liable after a trial." (*Ibid.*)

---

[16] The facts of *Tech-Bilt, supra,* 38 Cal.3d 488, make it clear that the trial court's good faith determination must take into account the settling tortfeasor's potential liability for indemnity to a cotortfeasor, as well as the settling tortfeasor's potential liability to the plaintiff. In *Tech-Bilt,* the settling tortfeasor faced no direct liability to the plaintiff because the statute of limitations on the plaintiff's action against that tortfeasor had expired; the settling tortfeasor, however, was still subject to an indemnity action by a nonsettling tortfeasor who had been timely sued by the plaintiff. In *Tech-Bilt,* we concluded that an agreement between the plaintiff and settling tortfeasor which purported to absolve the settling tortfeasor from all liability without any payment on its part was not a "good faith" settlement within the meaning of section 877.6 and would not operate to bar the nonsettling tortfeasor's indemnity action. (38 Cal.3d at pp. 501-502.) Since the no-payment settlement would not have been unfair if we had confined our view to the settling tortfeasor's potential liability to the plaintiff—because of the statute of limitations the settling tortfeasor's likely liability to the plaintiff was zero—the result in *Tech-Bilt* necessarily turned on the fact that the settlement was unfair when the effect of the settlement on the nonsettling tortfeasor's indemnity claim was taken into consideration.

[17] As noted above, in this case Far West did not challenge the terms of the D & S settlement agreement at the good faith hearing and never urged the court to withhold its good faith determination until the D & S defendants agreed to assume all or a substantial portion of the sum which Far West had already paid to the plaintiff.

In this regard, however, a nonsettling vicariously or derivatively liable tortfeasor is, of course, in exactly the same position as any other minimally culpable tortfeasor, and the minor departure from a theoretically precise allocation of loss which the statute sanctions is simply the price that nonsettling defendants uniformly bear to promote the settlement of litigation. By contrast, if we were to adopt the interpretation of section 877.6, subdivision (c) sought by Far West, exempting tortfeasors claiming total indemnity from the effect of a good faith settlement, we would not further the objective of achieving a fair apportionment of costs among *all* tortfeasors as Far West suggests, but rather would simply create an unfair and arbitrary distinction between those tortfeasors who should equitably bear only a minuscule portion of the loss and those who should equitably be permitted to shift all of the loss. The purposes of section 877.6, subdivision (c) do not support such a distinction.

## III

In sum, in light of the judicial background, the legislative history and the statutory purposes of section 877.6, subdivision (c), we conclude that a tort defendant who has entered into a good faith settlement within the meaning of section 877.6, subdivision (c) is absolved of any further liability for all equitable indemnity claims, including claims seeking total equitable indemnity.

The judgment of the Court of Appeal is affirmed.

Lucas, C. J., Mosk, J., Broussard, J., and Panelli, J., concurred.

**KAUFMAN, J.,** Concurring and Dissenting.—I agree with the majority that a "good faith settlement" in conformity with Code of Civil Procedure[1] section 877.6 as interpreted in *Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates* (1985) 38 Cal.3d 488 [213 Cal.Rptr. 256, 698 P.2d 159] (hereafter *Tech-Bilt*) and its progeny bars a claim for total indemnity against the settling defendant when that claim is based on theories of "equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault" as is expressly provided by subdivision (c) of section 877.6 (hereafter section 877.6(c)). However, the only indemnity claims barred by the statute are those enumerated, and a claim for total indemnity based on a theory of vicarious liability, such as that involved in this case, is not and never was a claim based on a theory of either "equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault." Thus, the

---

[1] All statutory references are to the Code of Civil Procedure unless otherwise specified.

edict handed down today—that a total indemnity claim based on vicarious liability is barred pursuant to section 877.6(c)—is wholly unauthorized by the statute.

As I shall explain, the purported justification for the rule announced today, the encouragement of settlements, is unsound because the rule will actually deter overall settlement of cases involving vicariously liable defendants. But the truth is that the majority's belief that good policy supports the rule it promulgates is immaterial. A claim for total indemnity based on vicarious liability is simply not barred under the statute upon which the majority relies.

In addition, application of the newly promulgated rule to the facts of this case is not only unfair but little short of confiscatory. The essential facts are that the alleged vicariously liable defendant (Far West[2]) settled with the plaintiff first and paid the settlement amount. Without doubt that was done with the full expectation it could pursue its right to indemnification from the alleged wrongdoers (the D & S defendants), a right which ripened upon payment of the settlement amount. The alleged wrongdoers thereafter unilaterally entered into a separate settlement with the plaintiff and this court now holds the vicariously liable defendant's clear right to pursue the wrongdoer for indemnification is barred. It theorizes that in determining a wrongdoer's settlement is in good faith the trial court can take into consideration the fact that another defendant's liability is vicarious only. But there is no indication that the trial court actually did so in this case. Thus, the result reached by the majority is not only unauthorized, it is also unjust.

I also dissent from the majority's wholly gratuitous ruling, on a question not at all in issue in this case, that a settling tortfeasor has an unqualified "right to continue to seek indemnification" (*ante,* p. 801) from any nonsettling joint tortfeasor. Here, both defendants have settled and no such question arises. It is astounding that without discussion, briefing or argument the court would reach out to resolve a question not remotely presented and in the process fail to consider the limitations that ought to be imposed on a settling defendant's right to pursue equitable indemnity claims.

### I. A CLAIM FOR TOTAL INDEMNITY BASED ON VICARIOUS LIABILITY IS DIFFERENT IN KIND FROM OTHER INDEMNITY CLAIMS

Section 876, subdivision (b) (hereafter section 876(b)) provides: "Where one or more persons are held liable solely for the tort of one of them or of another, as in the case of the liability of a master for the tort of his servant,

---

[2] I adopt the majority opinion's party name conventions.

they shall contribute a single pro rata share, as to which there may be indemnity between them." By this provision the Legislature has recognized that a vicariously liable defendant is not a "tortfeasor" but an involuntary surety or guarantor—i.e., one who is liable for the tort of another. Vicarious liability means that the act or omission of one person (hereafter the fault-source tortfeasor) is imputed by operation of law to another and becomes the basis for holding both liable for the plaintiff's injuries. An indemnity claim based on vicarious liability is not premised on the relative fault or responsibility of the parties for the plaintiff's injury but rather on the simple fact that the claimant has been compelled by force of law to pay for the tort of the one against whom the claim is asserted.

The majority declares that vicarious liability is similar to strict products liability because similar justifications have been offered to explain why the law imposes them and from this premise leaps blithely but blindly to the conclusion that vicariously liable defendants should not be granted "special dispensation" from the rules applicable to "other . . . tortfeasors" (*ante,* p. 813, fn. 13.).

As the Legislature has recognized in section 876(b), one who is vicariously liable is not a tortfeasor. When the issue is equitable apportionment of responsibility for the plaintiff's loss, the vicariously liable party and the fault-source defendant are to be jointly assessed a single share based on the fault of the latter but as between themselves apportionment of loss is governed by the traditional rule of full equitable indemnity, a rule of loss *shifting* rather than loss *sharing*, as the law has recognized from very early days. (See *Bradley* v. *Rosenthal* (1908) 154 Cal. 420 [97 P. 875]; Comment, *Total Equitable Indemnity: Can It Pierce a Pretrial Settlement?* (1986) 20 Loyola L.A. L.Rev. 99, 104, fn. 29.)

Thus the majority's attempt to equate the venerable indemnity rights attending vicarious liability with those recently established for joint and concurrent tortfeasors, including defective product manufacturers, is not only logically and historically inaccurate, it is inconsistent with the statutory scheme. To recognize the unique character of vicarious liability is not to grant "special dispensation" to vicariously liable defendants. Unfairness may be practiced not only by applying different treatment to parties similarly situated but also by applying uniform treatment to parties situated differently. The majority practices the latter form of unfairness, which is every bit as destructive as the former.[3]

---

[3] Arriving at a workable definition of vicarious liability to guide parties and trial courts presents no great difficulty and is in any event required to effectuate section 876(b). The "intractable problem" to which the majority refers was the problem of defining the proper limits of total equitable indemnity after it was extended *beyond* vicarious liability to encompass the

## II. THE STATUTE DOES NOT AUTHORIZE OR SUPPORT THE RULE ADOPTED BY THE MAJORITY

The majority claims to derive support for its conclusions from the legislative history and the purpose of section 877.6. As I will show, the majority's interpretation of that provision finds no support in the plain language of the statute, the statutory scheme of which it is a part, or the history of its enactment.

In construing a statute to effectuate the Legislature's intent, we turn first to the words themselves, giving them their usual, ordinary meaning. (*Moyer v. Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224].) Section 877.6(c) provides that a good faith settlement releases the settlor from "any further claims against the settling tortfeasor or co-obligor for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault." The legislative intent deducible from the plain, ordinary meaning of these words is that the statutory bar resulting from settlement is limited to claims based on comparative negligence or comparative fault. That principles of *comparative* negligence or *comparative* fault can have no application in a situation *where the liability of one individual is imputed to another* seems too obvious to require elaboration, yet the majority opinion fails to acknowledge this patently indisputable proposition.

The majority argues that the term "comparative fault" has never been read literally and therefore its meaning may be expanded to reach whatever result the majority deems desirable. As authority the majority relies on *Daly v. General Motors Corp.* (1978) 20 Cal.3d 725 [144 Cal.Rptr. 380, 575 P.2d 1162], which held that principles of comparative negligence apply to actions founded on strict products liability, and on *Safeway Stores, Inc. v. Nest-Kart* (1978) 21 Cal.3d 322 [146 Cal.Rptr. 550, 579 P.2d 441], which held that comparative fault principles apply to apportion responsibility between negligent and strictly liable defendants. By permitting the conduct of a defendant who manufactures and markets a defective product to be characterized as "fault" these cases departed from the ordinary meaning of that term but at least they permitted the word "comparative" to retain some significance. A jury may compare the conduct of the defective product manufacturer with the conduct of the plaintiff or codefendant and assess the responsibility of each for producing the plaintiff's injury but no comparison is possible in a situation where one party's liability is premised on the act or omission of

elusive active-passive fault distinctions. (See *American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578, 594-595 [146 Cal.Rptr. 182, 578 P.2d 899].) That problem no longer exists and provides no justification for the rule announced today.

the other. To speak of "comparative fault" in this context is to speak in a cipher or code having no relation to the ordinary meaning of either word.

Apparently relying on the rule that statutory constructions which render some words surplusage should be avoided (*White* v. *County of Sacramento* (1982) 31 Cal.3d 676, 681 [183 Cal.Rptr. 520, 646 P.2d 191]), the majority argues that the reference in section 877.6 to claims for "partial or comparative indemnity" should be read as including claims for both partial and total equitable indemnity. But this argument erroneously assumes that the issue in this case is whether *all* claims for *total* equitable indemnity survive a good faith settlement by the party against whom the indemnity claim is asserted. As noted, I fully agree that section 877.6(c) bars claims against a settling party for total equitable indemnity if those claims are based on comparative negligence or comparative fault, including active-passive fault distinctions. The indemnity claim at issue here, however, is of a qualitatively different variety—it is based on vicarious liability. Nothing in the language of section 877.6(c) suggests it has any application to indemnity claims based on vicarious liability.

The conclusion that the settlement bar was not intended to apply to equitable indemnity claims based on vicarious liability is reinforced when section 877.6(c) is read in its statutory context, in accordance with the familiar rule of construction that "a statute should be construed with reference to the entire statutory system of which it forms a part in such a way that harmony may be achieved among the parts" (*Merrill* v. *Department of Motor Vehicles* (1969) 71 Cal.2d 907, 918 [80 Cal.Rptr. 89, 458 P.2d 33]).

Section 877.6(c) is part of title 11. In section 875, subdivision (f), the Legislature has declared: "This title [i.e., title 11] shall not impair any right of indemnity under existing law. . . ." As noted, section 876(b) expressly provides that where one party is vicariously liable for the tort of another "they shall contribute a single pro rata share, as to which there may be indemnity between them." Thus the right of indemnity based on vicarious liability enjoys explicit legislative recognition and approval.

More importantly, if section 877.6(c) does not "impair any right of indemnity under existing law," it cannot be read as barring any indemnity claims not barred under existing law at the time of its enactment. At that time, as will be demonstrated, indemnity claims based on vicarious liability had never been held subject to a good faith settlement bar.

This court's decision in *American Motorcycle Assn.* v. *Superior Court, supra,* 20 Cal.3d 578 (hereafter *American Motorcycle*) established a right of equitable indemnity based on comparative negligence or comparative fault

but adopted also a limitation that such claims would be barred against a party who entered into a good faith settlement with the plaintiff. In that decision we noted that under section 877 a good faith settlement discharges the settling party from all liability for contribution and we stated: "[W]hile we recognize that section 877, by its terms, releases a settling tortfeasor only from liability for contribution and not partial indemnity, we conclude that from a realistic perspective the legislative policy underlying the provision dictates that a tortfeasor who has entered into a 'good faith' settlement [citation] with the plaintiff must also be discharged from *any claim for partial or comparative indemnity that may be pressed by a concurrent tortfeasor*." (At p. 604, italics added.)

The majority would read the italicized language as including an equitable indemnity claim by a vicariously liable defendant against a fault-source tortfeasor. Again I insist that it is logically and semantically impossible to view an indemnity claim based on vicarious liability as one "for partial or comparative indemnity." This is just as true when applied to *American Motorcycle* as when applied to section 877.6. The majority reasons, however, that *American Motorcycle* did not establish a new doctrine of partial comparative indemnity as separate and distinct from the existing doctrine of total equitable indemnity, but instead modified the existing total equitable indemnity rule by replacing it with, or transmuting it into, a new system of partial indemnity based on comparative fault.

The majority's analysis rests on a false premise. The majority reasons that because *American Motorcycle* did not create a wholly new equitable indemnity action, the action for comparative partial indemnity must have replaced or superseded the earlier action for total equitable indemnity. The majority fails to acknowledge a third possibility, which is most faithful to the language used in *American Motorcycle*, that the action for partial indemnity based on comparative fault was intended to be a new subcategory within the broader class of equitable indemnity actions.[4] Had *American Motorcycle* intended that a good faith settlement by a fault-source tortfeasor bar an indemnity claim by a vicariously liable defendant, it would have been

---

[4] The *American Motorcycle* opinion refers to its holding as having "modified" (20 Cal.3d at pp. 583, 591, 598, 607) or as "expanding" (*id.* at p. 603) the existing equitable indemnity doctrine. It also refers to "the partial indemnity doctrine that we *adopt* today" (*id.* at pp. 603-604, italics added; see also, *id.* at p. 603) and to "*recognition* of a common law right of comparative indemnity" (*id.* at p. 602, italics added; see also, *id.* at p. 603 ["recognition of a common law partial indemnity doctrine"]). Thus the effect of the holding was to *recognize* and *adopt* a rule (partial or comparative indemnity) as a new variation within an existing doctrine (equitable indemnity), which was thereby *expanded* and *modified*. This usage is consistent with the opinion's express holding: "Accordingly, we hold that *under* the common law equitable indemnity doctrine a concurrent tortfeasor may obtain partial indemnity from cotortfeasors on a comparative fault basis." (*Id.* at p. 608, italics added.)

a simple matter to state that such a settlement would bar any claim for equitable or noncontractual indemnity. The use of the term "partial or comparative indemnity" in this context indicates unmistakably that something more limited was intended.

But any doubt on the question of what *American Motorcycle* actually decided was conclusively laid to rest by *Safeway Stores, Inc.* v. *Nest-Kart, supra,* 21 Cal.3d 322, in which this court stated it had "no occasion to determine . . . whether the comparative indemnity doctrine should be applied in a situation in which a party's liability is entirely derivative or vicarious in nature." (At p. 332, fn. 5.) The point was made even more clearly in *Mesler* v. *Bragg Management Co.* (1985) 39 Cal.3d 290, 305 [216 Cal.Rptr. 443, 702 P.2d 601]: "This court has not yet addressed the question whether an employer-judgment debtor has a right to obtain indemnification from an employee who has settled with the plaintiff." Thus it is beyond question that *American Motorcycle* did not determine that a good faith settlement would bar an indemnity claim based on vicarious liability.

When section 877.6(c) was enacted, therefore, neither *American Motorcycle* nor any other authority had established that a fault-source tortfeasor could achieve immunity from indemnity claims based on vicarious liability by unilaterally settling with the plaintiff. The majority's decision at this late date to extend the reach of section 877.6(c) to include vicarious liability indemnity claims conflicts not only with the plain meaning of that section's words, but also with subdivision (f) of section 875, which prohibits any construction of section 877.6(c) impairing indemnity rights existing at the time of its enactment.

## III. THE RULE ADOPTED WILL NOT PROMOTE SETTLEMENT

A vicariously liable defendant may seek an early full-value settlement with the plaintiff (anticipating reimbursement from the solvent fault-source tortfeasor) in order to limit the potential exposure, reduce litigation costs, and obtain the plaintiff's cooperation in litigation of the indemnity claim.[5] If

---

[5] The majority finds it implausible that a vicariously liable defendant would enter into a full-value settlement if the fault-source tortfeasor "is likely to be found 100 percent responsible" and asserts it is "much more likely that settlements will take the form of piecemeal contributions by individual defendants in some rough approximation to each defendant's likely proportionate responsibility for the plaintiff's damages." (*Ante,* p. 811, fn. 11.) These statements reveal a fundamental misunderstanding about vicarious liability. Under section 876(b) the vicariously liable defendant and the fault-source tortfeasor are responsible to the plaintiff for the same pro rata share. Should the case proceed to trial the vicariously liable defendant would be assessed whatever comparative fault share is attributable to the tort for which vicarious liability is imposed. Consequently, the "rough approximation" of the vicariously liable

a liability insurance carrier is controlling the defense, it may seek an early full-value settlement to avoid potential liability to its insured for breach of the covenant of good faith and fair dealing. (See, e.g., *Bodenhamer* v. *Superior Court* (1987) 192 Cal.App.3d 1472, 1476-1479 [238 Cal.Rptr. 177].) Under the rule espoused by the majority, a vicariously liable defendant will have a great disincentive to enter into a full-value settlement agreement absent a provision reserving to itself the power to veto any later settlement with the fault-source tortfeasor or a provision requiring the plaintiff to dismiss the causes of action against the fault-source tortfeasor.[6] (Cf. *Owen* v. *United States* (9th Cir. 1983) 713 F.2d 1461, 1467.)

Settlement provisions giving a settling defendant a veto over later settlements or requiring the plaintiff to dismiss causes of action against a fault-source tortfeasor will not be attractive to plaintiffs, who are certain to increase the amount required for settlement whenever such provisions are included. If the vicariously liable defendant is unwilling to pay the additional price there will be no settlement. Veto provisions have an added disadvantage in that, as this court has recognized, they make subsequent settlements with other defendants more difficult and thus "frequently result in unnecessary trials." (*Abbott Ford, Inc.* v. *Superior Court* (1987) 43 Cal.3d 858, 883 [239 Cal.Rptr. 626, 741 P.2d 124].)

The majority's rule will encourage early settlement by tortfeasors seeking immunity from indemnity claims by vicariously liable defendants to whom their fault will be imputed, but this incentive to settle is fostered at the expense of equitable apportionment of loss since it leaves the vicariously liable defendant to pay all or part of the plaintiff's remaining damages when in justice and equity that defendant should have full indemnity from the settlor. A defendant in this situation, deprived of recourse against a solvent party whose conduct is the sole basis of its liability, may well prefer to take its chances at trial rather than pay in settlement a claim it in good conscience believes should have been paid by another. (See Roberts, *The "Good Faith" Settlement: An Accommodation of Competing Goals* (1984) 17 Loyola L.A. L.Rev. 841, 929-930.)

Contrary to the majority's assurances, the trial court's inquiry into the good faith of the settlement will not adequately shield a vicariously liable

defendant's proportionate responsibility for the plaintiff's damages in the majority's hypothetical (which excludes the possibility of other parties being at fault) will be 100 percent.

[6] Unlike the majority, I think it improbable the vicariously liable tortfeasor will settle in reliance on the trial court's power to withhold its "good faith" approval of a later settlement by the fault-source tortfeasor which fails to provide reimbursement for the vicariously liable defendant. Realizing the great pressure on trial courts to approve settlements, and the unlikelihood of appellate reversal of a good faith determination, vicariously liable defendants will prefer and probably insist on the certainty of a veto or dismissal provision before making a substantial settlement with the plaintiff.

defendant against the consequences of a settlement by the fault-source tortfeasor. If good faith is determined by the settlor's having paid its fair share of the loss according to the "reasonable range" test of *Tech-Bilt, supra,* 38 Cal.3d 488, the vicariously liable defendant will not infrequently be exposed to substantial liability. Because there may be other nonsettling defendants in addition to the vicariously liable defendant, because liability may present a close question, and because a settlor is expected to pay less than if the case went to trial, a settlement by the fault-source tortfeasor for less than half of the plaintiff's estimated damages will often be found in good faith. (Cf. *Isaacson* v. *California Ins. Guarantee Assn.* (1988) 44 Cal.3d 775, 794 [244 Cal.Rptr. 655, 750 P.2d 297] [settlement offer for two-thirds of estimated damages unreasonably high where liability was a close question].) If the estimates of comparative fault and total damages used to determine the reasonable range prove at trial to have been too low (as not infrequently occurs), the damages ultimately assessed for the fault-source defendant's tort will far exceed the amount paid in settlement and the difference will be extracted from the pocket of the vicariously liable defendant.

While the majority opinion does not preclude a trial court from withholding approval from a settlement if it finds the vicariously liable defendant has been "improperly" excluded from settlement negotiations this hardly remedies the problem; the majority's suggestion that it does rests on the erroneous assumption that a party whose liability is strictly vicarious should contribute something in settlement even when the fault-source tortfeasor is solvent. The issue is not whether any defendant has been given a fair opportunity to participate in a settlement agreement but whether a solvent tortfeasor may shift any part of his own liability onto a vicariously liable defendant. In the context of the good faith determination this problem could be directly addressed by holding, as a matter of law, that a settlement which fails to provide for dismissal of vicarious liability causes of action based on the settlor's conduct is not in good faith, but the majority expressly rejects this solution.

Because of its adverse effect on settlements by vicariously liable defendants, the majority's rule will make full settlement of actions less likely, even though the rule may promote partial settlements between the plaintiff and the fault-source tortfeasor. If a claim for equitable indemnity based on vicarious liability *survives* settlement, on the other hand, the prospects of full settlement are favorable. The reasons why vicariously liable defendants are likely to enter into early full-value settlements have already been mentioned. As for the fault-source tortfeasors, their options are not confined, as the majority suggests, to declining settlement or settling without protection against equitable indemnity claims. To obtain both the benefits of settlement and complete immunity from equitable indemnity claims, the fault-source

defendant need only include in the settlement a provision obligating the plaintiff to dismiss vicarious liability causes of action. The plaintiff will, of course, demand consideration for such a provision but the cost is clearly one which the fault-source tortfeasor ought to bear.

A provision for dismissal of vicarious liability causes of action does not deter later settlements and it provides a clean and equitable solution in cases where a defendant is sued on both vicarious liability and fault theories, since only the vicarious liability causes of action need be included in the dismissal provision. A defendant against whom no vicarious liability causes of action remain will be more amenable to settlement of any remaining fault-based causes of action.

The majority notes that a vicariously liable defendant can bargain for dismissal of the plaintiff's action against the fault-source defendant but it refuses to acknowledge that a fault-source defendant can likewise bargain for dismissal of vicarious liability causes of action. If it is reasonable to impose on the settlor the burden of obtaining a dismissal in favor of the remaining defendant in the one situation (i.e., where the settlor is vicariously liable), why is it not at least equally reasonable in the other (i.e., where the settlor is a fault-source tortfeasor)? Clearly the burden and expense of obtaining a dismissal in favor of the remaining party should be imposed on the party who committed the tort rather than on the one vicariously liable for it.

## IV. A SETTLING DEFENDANT'S RIGHT TO PURSUE EQUITABLE INDEMNITY CLAIMS IS NOT UNQUALIFIED

Although admitting the issue is not presented, the majority states it is "clear under existing precedent" that Far West had the right to pursue its indemnity claims against nonsettling parties after it had settled with the plaintiff in this action.

Were the issue presented, I would be inclined to hold that a settling defendant's right to pursue a claim for comparative indemnity is not absolute but depends on whether the settlement amount substantially exceeds the settlor's fair share of the plaintiff's damages. The settlor's right of indemnity against nonsettling defendants is inextricably bound up with the determination of the good faith of the settlement and should be resolved by the trial court as part of that determination. Where a settling defendant insists on the right to proceed against nonsettling defendants for indemnity to recoup the consideration given in settlement, a court might very well, depending on the circumstances, find the settlement not in good faith in respect to the nonsettling defendant from whom recoupment is sought. A

court so concluding could condition its good faith determination on the voluntary dismissal of the settlor's indemnity cross-complaints.

A tortfeasor who has settled for an amount within the reasonable range of his liability has no claim in equity to partial reimbursement from other defendants in the event plaintiff's damages or the settlor's percentage of fault is determined at trial to be less than anticipated. The settlor has bought his peace and limited his exposure and in return "can fairly be said to have contracted away the right to any benefits resulting from a determination that the settlement was 'high.'" (Comment, *Comparative Negligence, Multiple Parties, and Settlements* (1977) 65 Cal.L.Rev. 1264, 1279.) Because a settlor is expected to pay less than if his liability were determined at trial (*Tech-Bilt, supra,* 38 Cal.3d at p.499), "low" settlements will greatly outnumber "high" settlements. Under basic notions of fairness and reciprocity, nonsettling defendants, who must make up the deficit caused by "low" settlements, should be freed from the threat of the settlor's indemnity claims and allowed to retain the benefit of the occasional "high" settlement.

My views on this issue are similar to, although less extreme than, those finding expression in section 1, subdivision (d), of the Uniform Contribution Among Tortfeasors Act, which provides: "A tortfeasor who enters into a settlement with a claimant is not entitled to recover contribution from another tortfeasor whose liability for the injury or wrongful death is not extinguished by the settlement nor in respect to any amount paid in a settlement which is in excess of what was reasonable." The commissioners' comment to this subdivision states: "The tortfeasor who settles removes himself entirely from the case so far as contribution is concerned if he is able and chooses to buy his peace for less than the entire liability. *If he discharges the entire obligation it is only fair to give him contribution from those whose liability he has discharged.*" (12 West's U. Laws Ann. (1975) p. 65, italics added.)

Permitting a settling party to pursue equitable indemnity against nonsettlors *is* logically justified in those instances where the settlor has paid *more* than his proportionate share of the loss. The clearest case is settlement by a party whose liability is entirely vicarious and who claims indemnity from the fault-source tortfeasor. As I have emphasized repeatedly, any payment by a party whose liability is wholly vicarious is an overpayment so long as the fault-source tortfeasor is solvent. Where the court making the good faith determination finds that the settlement constitutes an overpayment, the policies of equitable apportionment and encouragement of settlements will both be served by permitting the settlor to pursue equitable indemnity against nonpaying or underpaying tortfeasors.

## V. Conclusion

Vicarious liability is fundamentally different from other forms of tort liability. A claim for indemnity based on vicarious liability is not a claim "based on comparative negligence or comparative fault" within the meaning of section 877.6(c) and is not barred by that section when asserted against a defendant who has settled. The rule adopted by the majority today, permitting a tortfeasor's unilateral settlement to destroy a vicariously liable defendant's right of indemnity, is not only unauthorized by law, it violates fundamental notions of fairness: "One whom the law holds to an absolute liability for the wrongful act of another has been injured just as really, even though indirectly, by that wrongful act as though his property had been struck by the other's automobile in the first place. . . . [T]he right to indemnity in such circumstances . . . [is] supported by simple, fundamental tort law principles just as clearly as is the right to recover for injuries caused directly by the tortious act. Such indemnity is an imposition of liability for fault, and as such is designed to minimize the harshness of previously imposed liability without fault." (Leflar, *Contribution and Indemnity Between Tortfeasors* (1932) 81 U.Pa.L.Rev. 130, 148.)

In this case, it is not seriously disputed that Far West was sued on a vicarious liability theory as well as various fault-based theories and that Far West's indemnity cross-complaint against the D & S defendants, although hardly a model of clarity, adequately pleads a cause of action for total equitable indemnity sufficient to encompass a vicarious liability theory. Accordingly, as to that cause of action, the trial court erred in dismissing Far West's cross-complaint following the settlement between the plaintiff and the D & S defendants. I would reverse the judgment of the Court of Appeal as to that cause of action.

**EAGLESON, J.,** Concurring and Dissenting.—As does Justice Kaufman, I concur in the majority's opinion that a good faith settlement in conformity with Code of Civil Procedure section 877.6, as interpreted in *Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates* (1985) 38 Cal.3d 488 [213 Cal.Rptr. 256, 698 P.2d 159], bars a claim for total equitable indemnity against a settling defendant when the indemnity claim is based on theories of "equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault" as is provided by section 877.6, subdivision (c).[1]

I respectfully dissent, however, from the majority's additional holding that a total indemnity claim based on vicarious liability is also barred by

---

[1] All statutory references are to the Code of Civil Procedure unless indicated otherwise.

section 877.6, subdivision (c). I agree with Justice Kaufman's analysis that the majority's interpretation of section 877.6 is incorrect on this point (see Kaufman, dis. opn., pts. I and II), but I write separately to emphasize an even more fundamental flaw in the majority view—its basic unfairness.

### 1. *Unfairness*

The majority asserts that, "even when a nonsettling tortfeasor's liability may be *wholly vicarious or derivative* in nature, it does not invariably follow that equitable considerations will, as a matter of law, always call for the total shifting of loss to the more directly culpable tortfeasor." (Italics added.) Stated more clearly, the majority's conclusion is that a defendant who shares no blame whatsoever must share in the loss, even when doing so is not necessary to ensure compensation for an injured plaintiff. The majority fails to explain why this result is necessary. Indeed, the only apparent premise for this conclusion is contained in a footnote. (See maj. opn., *ante,* at p. 813, fn. 13.) The unfortunate effect of the majority's holding as to vicariously liable defendants is to elevate pragmatism over principle and expediency over equity.

The majority reasons that vicarious liability expresses a social policy favoring the shifting of loss from an injured plaintiff to a derivatively liable defendant. I agree there are sound reasons for such shifting, but the policy concerns that support vicarious liability are not present when the issue is how the loss will be apportioned *among defendants.* In this case, plaintiffs have been fully compensated, at least to the extent they were damaged by the defendants relevant to this appeal. There is no longer a need to protect plaintiffs. Fairness has been achieved as to them. The remaining question is whether it has been achieved among the settling defendants. It has not.

The majority also erroneously relies on *Safeway Stores, Inc.* v. *Nest-Kart* (1978) 21 Cal.3d 322, 330 [146 Cal.Rptr. 550, 579 P.2d 441], in which the court discussed the application of equitable indemnity principles in the product liability context and found that liability could be apportioned among multiple tortfeasors even if one or more of the tortfeasors were responsible under the doctrine of strict liability. There are at least three reasons why that case does not support the majority's reasoning as to vicariously liable defendants. First, a strictly liable defendant is *directly* liable to the injured plaintiff whereas a vicariously liable defendant is only *derivatively* liable. Second, a strictly liable defendant is an active tortfeasor, i.e., he is responsible for his own conduct. A vicariously liable defendant, however, is a passive tortfeasor whose liability is based only on another party's wrongdoing. Third, a strictly liable defendant may be at "fault" to some degree. Despite the characterization of strict liability as being liability

without fault, it is often stated that strict liability, at least in some forms, does have a fault component. (*DeLeon* v. *Commercial Manufacturing & Supply Co.* (1983) 148 Cal.App.3d 336, 350 [195 Cal.Rptr. 867]; *Balido* v. *Improved Machinery, Inc.* (1972) 29 Cal.App.3d 633, 640 [105 Cal.Rptr. 890]; see generally 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 1244, pp. 679-680.)[2] A vicariously liable defendant, however, is without true fault.

The majority also states that, "a nonsettling vicariously or derivatively liable tortfeasor is, of course, in exactly the same position as any other minimally culpable tortfeasor. . . ." Because there is no support for this conclusion, the majority offers none. There are many differences between a vicariously liable tortfeasor and other "minimally culpable" tortfeasors. As explained above, the most obvious difference is that the vicariously liable tortfeasor is responsible only for what another party has done. Other "minimally culpable" defendants are responsible for their own wrongdoing. Another difference is that a vicariously liable defendant, by definition, has done nothing intentional, whereas other minimally culpable defendants are often charged with intentional torts. Indeed, one of the most egregious results of the majority's decision will be in those cases in which a vicariously liable defendant is precluded from seeking indemnity from an intentional tortfeasor whose acts have been the basis for suit against the vicariously liable defendant.[3]

In short, the majority offers no sound reason why a vicariously liable defendant should be required to pay part of a plaintiff's damages, yet be denied the opportunity to seek indemnity from the very tortfeasor who created, by his own active wrongdoing, the liability of the vicariously liable defendant. Such result has no basis in common sense or fairness.

## 2. *"Good Faith" Settlement Practices*

The majority optimistically presumes the potential unfairness to vicariously liable defendants will be eliminated by the requirement of section

---

[2] In *DeLeon* v. *Commercial Manufacturing & Supply Co., supra,* 148 Cal.App.3d 336, 348, the court explained, "Dean Prosser has not overlooked this melding of legal theory [of strict liability and fault]. In reference to product design, he notes that it is one of 'two particular areas in which the liability of the manufacturer, even though it may occasionally be called strict, appears to rest primarily upon a departure from proper standards of care, so that the tort is essentially a matter of negligence.' (Prosser, Law of Torts (4th ed. 1971) p. 644, fn. omitted.) [¶] Similarly, in *Balido* v. *Improved Machinery, Inc., supra,* 29 Cal.App.3d at p. 640, the court observed that in deficient design cases 'strict liability and negligence claims merge.' "

[3] Such a case is not a remote possibility. "Liability under the doctrine of respondent superior extends to malicious acts and other intentional torts of an employee committed within the scope of his employment." (2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency and Employment, § 135, pp. 131-132.)

877.6 that the trial court must find a settlement to be in good faith for it to operate as a bar to indemnity actions against the settling defendant. As a matter of law and logic, however, when there are two defendants—one directly liable and the other only vicariously liable—a settlement by the directly liable defendant can be in good faith under section 877.6 only if the settlement leaves nothing to be paid by the vicariously liable defendant. The majority refuses to state this proposition as a matter of law, claiming that there may be cases when a loss shifting is appropriate. As explained above, the loss shifting favored by the majority is not appropriate unless necessary to ensure compensation to an injured plaintiff, and the majority fails to offer a single reason why loss shifting is appropriate when the plaintiff is fully compensated and the issue is only fair apportionment among defendants. Because the majority does not propose a rule that will ensure fairness when the "good faith" determination is made, it is incorrect for the majority to state that such determination will itself ensure fairness to the vicariously liable defendant.

Even if the majority were correct that a settlement by a directly liable defendant can be in good faith when it leaves something to be paid by the vicariously liable defendant, the factual premise of the majority's presumption of fairness in the good faith determination is sound only if trial courts are especially solicitous of the rights of defendants whose liability is truly only vicarious. It is quite easy in many cases to plead and argue that a vicariously liable defendant also has some degree of direct liability, for example, negligent supervision of an employee who has caused an accident. There are also extreme pressures on our trial courts to dispose of as many cases as possible by settlement. In light of the potential for unfairness under the majority opinion, a trial court should carefully scrutinize such claims, and where a nonsettling defendant appears to be only vicariously liable, the trial court should require a compelling showing that the nonsetting defendant is liable on some other basis before approving a settlement that leaves any amount to be paid by that defendant.

The vicariously liable defendant's counsel must also share in the responsibility for ensuring fairness. Counsel should conduct adequate discovery and be prepared at the hearing under section 877.6 to demonstrate that his client's liability is only vicarious.

If the trial courts and defendants' counsel are diligent, perhaps they can mitigate or even avoid the potential unfairness sanctioned by the majority.